JUIDICE ᴇᴛ ᴀʟ., JUDGES *v.* VAIL ᴇᴛ ᴀʟ.

No. 75–1397.   Argued November 30, 1976—Decided March 22, 1977

REHNQUIST, J., delivered the opinion of the Court in which BURGER, C. J., and WHITE, BLACKMUN, and POWELL, JJ., joined. STEVENS, J., filed an opinion concurring in the judgment, *post*, p. 339. BRENNAN, J., filed a dissenting opinion, in which MARSHALL, J., joined, *post*, p. 341. STEWART, J., filed a dissenting opinion, *post*, p. 347.

*A. Seth Greenwald,* Assistant Attorney General of New York, argued the cause for appellants. With him on the briefs were *Louis J. Lefkowitz,* Attorney General, and *Samuel A. Hirshowitz,* First Assistant Attorney General.

*Jane E. Bloom* argued the cause for appellees. With her on the brief were *John D. Gorman, Joseph J. Levin, Jr.,* and *Morris Dees.**

MR. JUSTICE REHNQUIST delivered the opinion of the Court.

Appellee Harry Vail, Jr., is a judgment debtor who was held in contempt of court by the County Court of Dutchess County, N. Y., and who thereafter sought to have the statutory provisions authorizing contempts enjoined as unconstitutional

---

*\*Carl G. Dworkin* filed a brief for the New York State Consumer Protection Board as *amicus curiae* urging affirmance.

in an action brought under 42 U. S. C. § 1983 in the United States District Court for the Southern District of New York. The state-court proceedings against Vail were found by the District Court to be in most respects representative of those against the other named appellees as well.[1]

Vail defaulted on a credit arrangement with the Public Loan Co., and in January 1974, a default judgment for $534.36 was entered against him in the City Court of Poughkeepsie, N. Y. Three months later, when the judgment remained unpaid, Vail was served with a subpoena requiring him to attend a deposition so as to give information relevant to the satisfaction of the judgment.[2] The subpoena required him to appear at the office of the creditor's attorney on May 28, a little more than a month after the date on which it was served, and stated, as is required by N. Y. Civ. Prac. Law § 5223 (McKinney 1963), that "failure to comply . . . is punishable as a contempt of court."

Vail did not appear for the deposition. Nearly two months after the scheduled deposition date, appellant Juidice, a Justice of the Dutchess County Court, issued an order requiring Vail to appear in that court on August 13 to show cause why he should not be punished for contempt.[3] Vail failed to appear for that hearing. On August 30, appellant Juidice entered an order holding Vail in contempt and imposing a fine in the amount of $250 plus costs.[4] Vail failed to pay the

---

[1] There originally were three named plaintiffs. Subsequent to the bringing of this suit, five additional named plaintiffs were added. We conclude, *infra*, at 331–333, that not all of the named plaintiffs had the requisite standing to seek the relief sought.

[2] The issuance of the subpoena is authorized by N. Y. Civ. Prac. Law §§ 5223 and 5224 (McKinney 1963). These subpoenas are issued by the creditor's attorney, acting, however, as an officer of the court, cf. N. Y. Civ. Prac. Law § 2308 (a) (McKinney 1974).

[3] N. Y. Jud. Law § 757 (1) (McKinney 1975).

[4] §§ 770, 772, 773. The fine was payable to the Public Loan Co. in reduction of its judgment.

fine. On September 23, appellant Juidice issued an *ex parte* commitment order,[5] and Vail was arrested and jailed pursuant to this order on October 1. He was released the following day when he paid the fine which had been imposed by the order.

Shortly thereafter, Vail, who had ignored for a period of more than nine months every stage of the state-court proceedings in which he had been a defendant, became a plaintiff in an action brought in the United States District Court. He and his coplaintiffs there sought to enjoin, on behalf of a class of judgment debtors, the use of the statutory contempt procedures authorized by New York law and employed by appellant justices on the ground that the procedures leading to imprisonment for contempt of court violated the Fourteenth Amendment to the United States Constitution. As they never appeared in the New York courts, they obviously did not raise these constitutional claims in the state-court proceedings. The contentions made before the District Court, however, *could* have been raised by appellees in the state courts, as a defense to the ongoing proceedings.[6] Had the County Court ruled against these contentions, appellees could have appealed to the Appellate Division of the Supreme Court.[7] They chose, by resorting to the federal courts, not to avail themselves of this forum afforded them by the State of New York. We must decide whether, with the existence of an available forum for raising constitutional issues in a state judicial proceeding, the United States District Court could properly entertain appellees' § 1983 action in light of our decisions in *Younger* v. *Harris,* 401 U. S. 37 (1971), and *Huffman* v. *Pursue, Ltd.,* 420 U. S. 592 (1975). We hold that it could not.

---

[5] § 756.

[6] See n. 14, *infra.*

[7] See N. Y. Civ. Prac. Law § 5701 (a) (2) (McKinney 1963); *Rudd* v. *Rudd,* 45 App. Div. 2d 22, 356 N. Y. S. 2d 136 (1974).

## I

A three-judge District Court was convened in response to appellees' complaint and the action was later certified as a Fed. Rule Civ. Proc. 23 (b)(2) class action. The class was defined to include "all persons who have been, or are presently subject to the civil contempt proceedings contained in the challenged sections of the Judiciary Law." App. to Jurisdictional Statement 18a. At the same time the District Court rendered an opinion granting partial summary judgment to the appellees and

> "declaring that Sections 756, 757, 770, 772, 773, 774 and 775 of the Judiciary Law of the State of New York are unconstitutional on their face and permanently enjoining the operation of said statutes against plaintiffs and members of their class, namely, all persons who have been or are presently subject to civil contempt proceedings pursuant to the above sections of the Judiciary Law . . . ." *Id.*, at 20a.

Appellants in this Court challenged the District Court's failure to abstain on *Younger* grounds as well as its decision on the merits. We noted probable jurisdiction, 426 U. S. 946, and since we agree with appellants' first contention we do not reach the merits of the constitutional dispute.[8]

Although raised by neither of the parties, we are first obliged to examine the standing of appellees, as a matter of the case-or-controversy requirement associated with Art. III, to seek injunctive relief in the District Court. *North Carolina* v. *Rice,* 404 U. S. 244 (1971); *O'Shea* v. *Littleton,* 414 U. S. 488, 493–498 (1974). At the time this lawsuit was

---

[8] Since we find that the District Court erred in reaching the merits of the injunctive claim, we need not decide whether the District Court's action in granting partial summary judgment was proper, when neither party had moved for summary judgment and when the state defendants had not yet answered the complaint.

commenced, or the additional appellees added, the named appellees, except Patrick Ward and Joseph Rabasco, had already been imprisoned pursuant to the contempt order, and, again excepting Ward and Rabasco, had been released after payment of the court-imposed fine. Ward had not been imprisoned, but alleged that he was "in imminent danger of being imprisoned pursuant to the Order of Contempt . . . ." Complaint ¶ 55. A temporary restraining order, which has remained in effect throughout this lawsuit, was issued by the District Court, enjoining the State from incarcerating Ward pursuant to the contempt order. Rabasco similarly alleged the threat of imprisonment after the issuance by the state court of an order to show cause which he has not complied with. The District Court restrained further state proceedings against Rabasco.

All of the named appellees, except Ward and Rabasco, then, having been released from jail, no longer had a live controversy with appellants or other New York State officials as to either the contempt citation or the short periods of incarceration which would entitle them to injunctive relief. These New York supplemental proceedings, which follow judgments on a debt, differ in this respect from the Ohio State proceedings involved in *Huffman, supra*. In *Huffman*, the Ohio State court had closed down the federal plaintiff's movie house for a period of time in the future. Although its decree had become final at the time the federal plaintiff instituted its federal action, the effect of the decree continued. 420 U. S., at 598. That plaintiff accordingly had the requisite standing. *O'Shea* v. *Littleton, supra,* at 495–496. Here, however, once the period of incarceration is served or the fine paid, the effect of the orders imposing a fine or commitment has expended itself. And, in the case where the payment of the fine satisfies the entire judgment, not only the orders in the supplemental proceedings but the original judgment as well is rendered *functus officio*. As

the complaint does not allege, and as the District Court did not find, that these appellees were threatened with further or repeated proceedings, only Ward and Rabasco had the necessary standing to seek injunctive relief.[9] See *Ellis* v. *Dyson*, 421 U. S. 426 (1975); *Steffel* v. *Thompson*, 415 U. S. 452 (1974). Appellees Ward and Rabasco do have standing, since they are subject to pending proceedings in the state courts. Since Ward and Rabasco have standing, and since their standing, unlike that of the plaintiff in *Steffel* v. *Thompson, supra,* is predicated on the existence of a pending, and not merely a threatened, proceeding, we deal with appellants' *Younger* contentions.

The District Court decided that our holdings in *Younger* and *Huffman* did not mandate dismissal of the complaint in this case, because the action sought to be enjoined in *Younger* was a criminal prosecution, and the action sought to be enjoined in *Huffman* was for the abatement of a civil nuisance and therefore closely akin to a criminal proceeding.[10] This

---

[9] While several of the named appellees, upon payment of the fine, had satisfied the underlying default judgment, this is not true in all of the cases. Appellee Vail, for example, owed, pursuant to the default judgment, $534.36. His payment of the contempt fine of $250 plus costs, did not satisfy the full default judgment. As to him, and the other appellees similarly situated, since the underlying action on the debt, to which the contempt proceedings were ancillary, had not ended, it is conceivable that the prospect of further contempt orders in the underlying action could have given Vail the requisite constitutional standing to seek to enjoin the contempt processes as unconstitutional. But standing cannot be based on such speculative conjectures which are neither alleged nor proved. Since the complaint does not allege the likelihood, or even the possibility, of future contempt orders, none of the appellees, excepting Ward and Rabasco, have standing. *O'Shea* v. *Littleton,* 414 U. S. 488, 493–499 (1974); *Linda R. S.* v. *Richard D.,* 410 U. S. 614, 617 (1973).

[10] The District Court read *Younger* as applying "to civil proceedings only when intervention would disrupt the very interests which would underlie a state's criminal laws." *Vail* v. *Quinlan,* 406 F. Supp. 951, 958.

was not an implausible reading of our holdings in those cases, since in *Huffman,* the most recent of the two, we had reserved the applicability of abstention to civil cases generally in this language:

> "Informed by the relevant principles of comity and federalism, at least three Courts of Appeals have applied *Younger* when the pending state proceedings were civil in nature. See *Duke* v. *Texas,* 477 F. 2d 244 (CA5 1973); *Lynch* v. *Snepp,* 472 F. 2d 769 (CA4 1973); *Cousins* v. *Wigoda,* 463 F. 2d 603 (CA7 1972). For the purposes of the case before us, however, we need make no general pronouncements upon the applicability of *Younger* to all civil litigation. It suffices to say that for the reasons heretofore set out, we conclude that the District Court should have applied the tests laid down in *Younger* in determining whether to proceed to the merits of appellee's prayer for relief against this Ohio civil nuisance proceeding." 420 U. S., at 607.

We now hold, however, that the principles of *Younger* and *Huffman* are not confined solely to the types of state actions which were sought to be enjoined in those cases. As we emphasized in *Huffman,* the " 'more vital consideration' " behind the *Younger* doctrine of nonintervention lay not in the fact that the state criminal process was involved but rather in

> " 'the notion of "comity," that is, a proper respect for state functions, a recognition of the fact that the entire country is made up of a Union of separate state governments, and a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways.' " *Huffman,* 420 U. S., at 601, quoting *Younger,* 401 U. S., at 44.

This is by no means a novel doctrine. In *Ex parte Young,* 209 U. S. 123 (1908), the watershed case which sanctioned the use of the Fourteenth Amendment to the United States Constitution as a sword as well as a shield against unconstitutional conduct of state officers, the Court said:

> "But the Federal court cannot, of course, interfere in a case where the proceedings were already pending in a state court. *Taylor* v. *Taintor,* 16 Wall. 366, 370; *Harkrader* v. *Wadley,* 172 U. S. 148." *Id.,* at 162.[11]

These principles apply to a case in which the State's contempt process is involved. A State's interest in the contempt process, through which it vindicates the regular operation of its judicial system, so long as that system itself affords the opportunity to pursue federal claims within it, is surely an important interest. Perhaps it is not quite as important as is the State's interest in the enforcement of its criminal laws, *Younger, supra,* or even its interest in the maintenance of a quasi-criminal proceeding such as was involved in *Huffman, supra.* But we think it is of sufficiently great import to require application of the principles of those cases. The contempt power lies at the core of the administration of a State's judicial system, cf. *Ketchum* v. *Edwards,* 153 N. Y. 534, 539, 47 N. E. 918, 920 (1897). Whether disobedience of a court-sanctioned subpoena, and the resulting process leading to a finding of contempt of court, is labeled civil, quasi-criminal, or criminal in nature, we think the

---

[11] Neither *Ex parte Young,* nor the cases cited by it, expressly premised this conclusion on § 5 of the Judiciary Act of 1793, 1 Stat. 335, or its successor sections (now 28 U. S. C. § 2283). These cases, rather, are "an application of the reason underlying the Act," *Toucey* v. *New York Life Ins. Co.,* 314 U. S. 118, 135 (1941), and reflect the applicability, wholly independent of a statutory codification, of the longstanding policies which inhere in the notions of comity and federalism, see *Younger,* 401 U. S., at 43–45; 1 J. Kent, Commentaries on American Law *411–412.

salient fact is that federal-court interference with the State's contempt process is "an offense to the State's interest . . . likely to be every bit as great as it would be were this a criminal proceeding," *Huffman, supra,* at 604.[12] Moreover, such interference with the contempt process not only "unduly interfere[s] with the legitimate activities of the Stat[e]," *Younger, supra,* at 44, but also "can readily be interpreted 'as reflecting negatively upon the state court's ability to enforce constitutional principles,' " *Huffman, supra,* at 604.[13]

The District Court relied upon our decision in *Gerstein* v. *Pugh,* 420 U. S. 103 (1975), to justify its refusal to dismiss appellees' suit, and it spoke of the possibility that a debtor in the position of appellees might be "thrown in jail without an *actual* hearing" (emphasis added). But *Gerstein* explained the reason for the inapplicability of *Younger* to that case in a way which clearly distinguishes it from this:

> "The District Court correctly held that respondents' claim for relief was not barred by the equitable

---

[12] Contempt in these cases, serves, of course, to vindicate and preserve the private interests of competing litigants, *People ex rel. Munsell* v. *Court of Oyer and Terminer,* 101 N. Y. 245, 247–249, 4 N. E. 259, 259–261 (1886), but its purpose is by no means spent upon purely private concerns. It stands in aid of the authority of the judicial system, so that its orders and judgments are not rendered nugatory, *Ketchum* v. *Edwards,* 153 N. Y. 534, 539, 47 N. E. 918, 920 (1897) ("The interest in maintaining respect for the action of courts, and of orderly jurisprudence, forbids that litigants should be permitted, under plea of hardship or injustice, real or pretended, to nullify or set at nought orders or decrees, however improvidently made, even if it may seem certain that the court acted in granting them under misapprehension or mistake"); cf. *Gompers* v. *Bucks Stove & Range Co.,* 221 U. S. 418, 443 (1911); *King* v. *Barnes,* 113 N. Y. 476, 21 N. E. 182 (1889).

[13] As we did in *Huffman,* we save for another day the question of "the applicability of *Younger* to all civil litigation," 420 U. S., at 607.

restrictions on federal intervention in state prosecutions, *Younger* v. *Harris*, 401 U. S. 37 (1971). The injunction was not directed at the state prosecutions as such, but only at the legality of pretrial detention without a judicial hearing, *an issue that could not be raised in defense of the criminal prosecution.*" 420 U. S., at 108 n. 9. (Emphasis added.)

Here it is abundantly clear that appellees had an *opportunity* to present their federal claims in the state proceedings.[14] No more is required to invoke *Younger* abstention. There is no support in *Gerstein* or in our other cases for the District Court's belief that the state courts must have an *actual* hearing (to which a recalcitrant defendant would presumably be brought by force) in order for *Younger* and *Huffman* to apply. Appellees need be accorded only an opportunity to fairly pursue their constitutional claims in the ongoing state proceedings, *Gibson* v. *Berryhill*, 411 U. S. 564, 577 (1973), and their failure to avail themselves of such opportunities does not mean that the state procedures were inadequate.[15] Presumptively, therefore, the principles which underlie *Younger* call for dismissal of the action.

[14] The most propitious moment would have been at the hearing on the order to show cause. Even after the order of contempt had been issued, a motion to vacate pursuant to N. Y. Civ. Prac. Law § 5015 (McKinney Supp. 1976–1977) was available, and it would have been possible to seek a stay or a temporary restraining order on the fine and commitment, see N. Y. Civ. Prac. Law § 2201 (McKinney 1974); *Rudd* v. *Rudd,* 45 App. Div. 2d 22, 356 N. Y. S. 2d 136 (1974). Should the state courts ultimately have sustained the validity of the state statutory system, appellees would have had final recourse, available as of right, to this Court, 28 U. S. C. § 1257 (2).

[15] It does not appear settled in New York whether persons faced with civil contempt will be assigned counsel if indigent, see *Rudd* v. *Rudd, supra;* but cf. *In re Smiley*, 36 N. Y. 2d 433, 330 N. E. 2d 53 (1975) (no inherent power in courts to direct provision of counsel or to require

## II

We noted in *Huffman* that *Younger* principles do not apply, even where otherwise applicable,

> "in those cases where the District Court properly finds that the state proceeding is motivated by a desire to harass or is conducted in bad faith, or where the challenged statute is ' "flagrantly and patently violative of express constitutional prohibitions in every clause, sentence and paragraph, and in whatever manner and against whomever an effort might be made to apply it." ' " *Huffman,* 420 U. S., at 611.

We think it wholly impossible to say that the New York statutes in question here met the second part of this exception. Nor is the first part of the exception either alleged in appellees' complaint or proved by their evidence. While some paragraphs of the complaint could be construed to make such allegations as to the creditors, there are no comparable allegations with respect to appellant justices who issued the contempt orders. This exception may not be utilized unless it is alleged and proved that they are enforcing the contempt procedures in bad faith or are motivated by a desire to harass. Cf. *Cameron* v. *Johnson,* 390 U. S. 611, 619 (1968). There are neither allegations, proof, nor findings to that effect here.

We conclude that the District Court erred in enjoining enforcement of the New York Judiciary Law's contempt procedures for the reasons of federalism and

---

the compensation of retained counsel in private suits; no "risk of loss of liberty or grievous forfeiture"). In any case, the relevant datum is that the due process contentions concerning assigned counsel, as with the other contentions, could have been presented to the New York State courts by the same parties or their attorneys who, instead, chose to ignore the pending state-court proceedings by filing this suit in federal court.

comity enunciated in *Younger* and *Huffman*.[16]    Its judgment is accordingly

*Reversed.*

MR. JUSTICE STEVENS, concurring in the judgment.

The major premise underlying the Court's holding in *Younger* v. *Harris,* 401 U. S. 37, is that a court of equity should not act when the moving party has an adequate remedy at law.[1]    Consistently with *Younger,* a court of equity may have a duty to act if the alternative legal remedy is inadequate.    Indeed, the major premise underlying the Court's holding in *Mitchum* v. *Foster,* 407 U. S. 225, is a recognition of the unfortunate fact that state proceedings are sometimes inadequate to vindicate federal rights.[2]

---

[16] Appellees Vail and McNair, apart from their request for declaratory and injunctive relief, also sought damages for alleged past violations of their constitutional rights stemming from the brief periods of incarceration. Appellants, however, are no longer involved in this aspect of the lawsuit, having been dismissed by the District Court on grounds of judicial immunity.    Appellees have not challenged the District Court's dismissal of the state-court justices from those counts, and none of the parties here have addressed the issue of the availability of damages to these appellees. The issue of damages is therefore not before us, and we intimate no opinion as to the applicability of *Younger-Huffman* principles to a § 1983 suit seeking only such relief in the District Court.    Cf. *Monroe* v. *Pape,* 365 U. S. 167 (1961); *Huffman* v. *Pursue, Ltd.,* 420 U. S., at 607 n. 19, 609 n. 21.

[1] "The precise reasons for this longstanding public policy against federal court interference with state court proceedings have never been specifically identified but the primary sources of the policy are plain. One is the basic doctrine of equity jurisprudence that courts of equity should not act, and particularly should not act to restrain a criminal prosecution, when the moving party has an adequate remedy at law and will not suffer irreparable injury if denied equitable relief." *Younger* v. *Harris,* 401 U. S., at 43–44.

[2] "Those who opposed the Act of 1871 [the forerunner of 42 U. S. C. § 1983] clearly recognized that the proponents were extending federal power in an attempt to remedy the state courts' failure to secure federal

The ultimate question in this case concerns the constitutionality of New York procedures designed to discover the assets of delinquent judgment debtors. If, as appellees' contend, these procedures violate the Due Process Clause of the Fourteenth Amendment, they cannot provide an adequate remedy for appellees' federal claim.[3] For the federal remedy that appellees seek is protection against being required to participate in an unconstitutional judicial proceeding. Even

rights. The debate was not about whether the predecessor of § 1983 extended to actions of state courts, but whether this innovation was necessary or desirable.

"This legislative history makes evident that Congress clearly conceived that it was altering the relationship between the States and the Nation with respect to the protection of federally created rights; it was concerned that state instrumentalities could not protect those rights; it realized that state officers might, in fact, be antipathetic to the vindication of those rights; and it believed that these failings extended to the state courts." *Mitchum* v. *Foster*, 407 U. S., at 241–242.

In a footnote the Court quoted this comment by Congressman Coburn:

" 'The United States courts are further above mere local influence than the county courts; their judges can act with more independence, cannot be put under terror, as local judges can; their sympathies are not so nearly identified with those of the vicinage; the jurors are taken from the State, and not the neighborhood; they will be able to rise above prejudices or bad passions or terror more easily. . . .' Cong. Globe, 42d Cong., 1st Sess., 460 (1871)." *Id.*, at 241 n. 31.

[3] The appellees argue that the procedures violate their due process rights because no proper notice of the fact that the noncooperating debtor is subject to incarceration for his actions is provided, because the procedures do not require a hearing with the debtor present prior to a finding of contempt and incarceration, and because the procedures do not provide for the right to counsel. If we assume that appellees are correct in their claim that they have a constitutional right to an actual hearing prior to incarceration, and that defects in the notice prevent the merits of that claim from being adjudicated in the state courts until after the incarceration has occurred, by hypothesis the state procedure cannot be adequate because appellees will have suffered the harm they seek to avoid before the state proceeding is concluded. Cf. *Gerstein* v. *Pugh*, 420 U. S. 103, 108 n. 9.

ultimate success in such a proceeding would not protect them from the harm they seek to avoid. The challenged state procedures, therefore, cannot themselves provide an adequate remedy for the alleged federal wrong.[4] By hypothesis, in a case such as this, *Younger* abstention is inappropriate.

I am less certain about the possible applicability of *Pullman* abstention, *Railroad Comm'n* v. *Pullman Co.*, 312 U. S. 496, on which MR. JUSTICE STEWART relies. I am persuaded, however, that we know enough about the way the New York procedure is actually administered to form a reliable opinion about its validity. I believe, therefore, we have a duty to reach the merits.

As the Court's recitation of the facts demonstrates, the New York procedure provides for adequate notice and gives the debtor adequate opportunities to be heard. Moreover, there is no denial of the impecunious debtor's right to counsel because proof of indigency, which would necessarily precede any appointment of counsel, would also provide a defense to a contempt charge. The New York procedure does not, therefore, deny the judgment debtor due process of law. Accordingly, I concur in the Court's judgment.

MR. JUSTICE BRENNAN, with whom MR. JUSTICE MARSHALL joins, dissenting.

I dissent. My earlier dissent in *Huffman* v. *Pursue, Ltd.*, 420 U. S. 592, 613–618 (1975), details the grounds for my disagreement with the Court's extension of *Younger* principles to *any* state civil proceedings, including the form they take in *Huffman* and the instant case, and no purpose would be served in restating those reasons here. I repeat, however, my strong disagreement with the process begun in *Huffman*, carried to the extreme in last Term's *Paul* v. *Davis*, 424 U. S. 693

---

[4] Perhaps another way to make the same point is to suggest that fidelity to the rationale of *Younger* would require the District Court to decide the merits of appellees' claims in order to decide whether to abstain.

(1976), and furthered today, of stripping all meaningful content from 42 U. S. C. § 1983. For, as I have said before: "Even if the extension of *Younger* v. *Harris* to pending state civil proceedings can be appropriate in any case . . . it is plainly improper in the case of an action by a federal plaintiff, as in this case, grounded upon 42 U. S. C. § 1983," 420 U. S., at 616. Congress created this cause of action over a century ago, and at the same time expressly charged the federal judicial system with responsibility for the vindication and enforcement of federal rights under it against unconstitutional action under color of state law "whether that action be executive, legislative, or *judicial*," *Mitchum* v. *Foster*, 407 U. S. 225, 240 (1972) (emphasis in original). In congressional contemplation, the pendency of state civil proceedings was to be wholly irrelevant. "The very purpose of § 1983 was to interpose the federal courts between the States and the people, as guardians of the people's federal rights . . . ." *Id.*, at 242. "Section 1983 opened the federal courts to private citizens, offering a uniquely federal remedy against incursions under the claimed authority of state law upon rights secured by the Constitution and laws of the Nation." *Id.*, at 239. That statute, and the Judiciary Act of 1875, 18 Stat. 470, which granted the federal courts general federal-question jurisdiction, completely altered Congress' pre-Civil War policy of relying on state courts to vindicate rights arising under the Constitution and federal laws. These statutes constituted the lower federal courts " 'the *primary* and powerful reliances for vindicating every right given by the Constitution, the laws, and treaties of the United States.' " *Steffel* v. *Thompson*, 415 U. S. 452, 464 (1974) (emphasis in original).

"In thus expanding federal judicial power, Congress imposed the duty upon all levels of the federal judiciary to give due respect to a suitor's choice of a federal forum for the hearing and decision of his federal constitutional claims. Plainly,

escape from that duty is not permissible merely because state courts also have the solemn responsibility, equally with the federal courts, '. . . to guard, enforce, and protect every right granted or secured by the Constitution of the United States.' . . . 'We yet like to believe that wherever the Federal courts sit, human rights under the Federal Constitution are always a proper subject for adjudication, and that we have not the right to decline the exercise of that jurisdiction simply because the rights asserted may be adjudicated in some other forum. . . .'" *Zwickler* v. *Koota*, 389 U. S. 241, 248 (1967). This is true notwithstanding the possibility of review by this Court of state decisions, for "even when available by appeal rather than only by discretionary writ of certiorari, [that possibility] is an inadequate substitute for the initial District Court determination . . . to which the litigant is entitled in the federal courts." *England* v. *Louisiana State Bd. of Medical Examiners,* 375 U. S. 411, 416 (1964).

In requiring the District Court to eject the federal plaintiff from the federal courthouse and to force him to seek vindication of his federal rights in pending state proceedings, the Court effectively cripples the congressional scheme enacted in § 1983. The crystal clarity of the congressional decision and purpose in adopting § 1983, and the unbroken line of this Court's cases enforcing that decision, expose *Huffman* and today's decision as deliberate and conscious floutings of a decision Congress was constitutionally empowered to make. It stands the § 1983 remedy on its head to deny the § 1983 plaintiff access to the federal forum *because* of the pendency of state civil proceedings where Congress intended that the district court should entertain his suit *without regard* to the pendency of the state suit. Rather than furthering principles of comity and our federalism, forced federal abdication in this context undercuts one of the chief values of federalism— the protection and vindication of important and overriding

federal civil rights, which Congress, in § 1983 and the Judiciary Act of 1875, ordained should be a primary responsibility of the federal courts.

*Mitchum* v. *Foster, supra,* buttresses this conclusion. *Mitchum* held that § 1983 comes within the "expressly authorized" exception of 28 U. S. C. § 2283 so as to permit a federal district court in a § 1983 suit to stay a proceeding in a state court. The process begun in *Huffman* and furthered today of cutting back the remedies available in federal court under § 1983 plainly reintroduces much of the rigidity of § 2283, thus realizing the prophecy that if *Younger* were extended to civil cases, "the significance of *Mitchum* for those seeking relief from state civil proceedings would largely be destroyed, and the recognition of section 1983 as an exception to the Anti-Injunction Statute would have been a Pyrrhic victory." The Supreme Court, 1971 Term, 86 Harv. L. Rev. 50, 217–218 (1972).

Today's decision extends *Huffman,* which labeled the state nuisance proceeding "in important respects . . . more akin to a criminal prosecution than are most civil cases." 420 U. S., at 604. By contrast the underlying suits in the New York courts here were collection suits typically involving small loans, and usually terminating in default judgments. Further, whereas in *Huffman* state officials were parties in the state-court suit, here those suits are between purely private parties. Whatever the importance of the State's direct interest in *Huffman* in closing theaters exhibiting alleged obscene films, one must strain hard to discover any comparable state interest here in having federal rights adjudicated in a state rather than a federal forum. Thus *Huffman*'s "quasi-criminal" rationale and today's reliance on state "contempt power" are revealed to be only covers for the ultimate goal of denying § 1983 plaintiffs the federal forum in any case, civil or criminal, when a pending state proceeding may hear the

federal plaintiff's federal claims.* This is nothing less than plain refusal to enforce the congressional direction, and for all practical purposes reduces *Mitchum* v. *Foster* to an empty shell.

Moreover, a requirement that the § 1983 plaintiff present his constitutional challenge in a suit between purely private parties pending in a state court may not be viewed as an unmixed blessing by the States. When *Younger* v. *Harris*, 401 U. S. 37 (1971), was decided, purely private state-court suits were seen as posing entirely different considerations from criminal prosecutions. *Id.*, at 55, and n. 2 (STEWART, J., concurring). Pending state criminal proceedings have always been viewed as paradigm cases involving paramount state interests. *Huffman*, 420 U. S., at 613–614 (BRENNAN, J., dissenting). But remitting the decision of the constitutionality of state statutes to state civil proceedings between purely private parties may actually run counter to state interests. If the State may not be heard in the state civil case, defense of the constitutionality of its statute would be solely in the hands of a party having neither the State's resources, expertise, nor governmental interest in sustaining the validity of the statute. A dilemma would be posed even for officials of a State like New York having procedures that permit, N. Y. Civ. Prac. Law § 1012 (b) (McKinney 1976), and in some cases require, N. Y. Exec. Law § 71 (McKinney 1972), state intervention in suits raising constitutional challenges to state statutes. They must choose whether to intervene in countless private lawsuits brought all over the State implicating the constitutionality of state statutes, or not to intervene and risk adverse decisions having effects far beyond the interests of the particular private

---

*I suspect that the purported disclaimer that "[a]s we did in *Huffman*, we save for another day the question of 'the applicability of *Younger* to all civil litigation . . . ,'" *ante*, at 336 n. 13, is tongue in cheek, and that "save" in today's disclaimer is a signal that merely the formal announcement is being postponed.

parties. By contrast, a § 1983 suit in federal court necessarily names the State or its officials as defendants, and the litigation focuses squarely on the issue of the validity of the statute, with the State defending its own interest directly.

Perhaps the process of eviscerating § 1983 should not come as a surprise. This Court in a series of decisions in other contexts has shaped the doctrines of jurisdiction, justiciability, and remedy so as increasingly to bar the federal courthouse door to litigants with substantial federal claims. See *Rizzo* v. *Goode,* 423 U. S. 362 (1976); *Simon* v. *Eastern Ky. Welfare Rights Org.,* 426 U. S. 26 (1976); *Warth* v. *Seldin,* 422 U. S. 490 (1975); *O'Shea* v. *Littleton,* 414 U. S. 488 (1974). The determination to keep § 1983 litigants out of the federal courthouse if they can be remitted to a state court, reflected not only in *Huffman* and today's decision but in other decisions, *e. g., Hicks* v. *Miranda,* 422 U. S. 332 (1975), hardly serves the values of federalism, any more than did last Term's decisions that so circumscribed the centuries-old remedy of habeas corpus as to weaken drastically the federal courts' ability to safeguard individuals from unconstitutional imprisonment. *Stone* v. *Powell,* 428 U. S. 465 (1976); *Francis* v. *Henderson,* 425 U. S. 536 (1976).

These decisions have in common that they have been rendered in the name of federalism. But they have given this great concept a distorted and disturbing meaning. Under the banner of vague, undefined notions of equity, comity, and federalism, the Court has embarked upon the dangerous course of condoning both isolated, *Paul* v. *Davis,* 424 U. S. 693 (1976), and systematic, *Rizzo* v. *Goode, supra,* violations of civil liberties. Such decisions hardly bespeak a true concern for equity. Nor do they properly reflect the nature of our federalism. "Adopting the premise that state courts can be trusted to safeguard individual rights, the Supreme Court has gone on to limit the protective role of the federal judiciary. But in so doing it has forgotten that one of the strengths of our federal

system is that it provides a double source of protection for the rights of our citizens. Federalism is not served when the federal half of that protection is crippled." Brennan, State Constitutions and the Protection of Individual Rights, 90 Harv. L. Rev. 489, 502–503 (1977). I dissent.

MR. JUSTICE STEWART, dissenting.

The District Court found New York's statutorily specified civil contempt procedures constitutionally inadequate. It reached that conclusion without the benefit of a state-court construction of the statute's procedural requirements; without consideration of whether the procedural infirmities found were limited to the class of subpoenaed civil debtors who originally filed suit; without, indeed, a determination as to whether the challenged procedures accurately reflect state-wide New York practice, or were instead confined to Dutchess County.* Constitutional adjudication in the face of such legal and factual imponderables is foolhardy: The subject matter of the suit is unclear, and the very need for constitutional adjudication is uncertain.

When a federal district court confronts such uncertainty in state law, its proper course is to abstain from final resolution of the federal issues until the state courts have been accorded an opportunity authoritatively to interpret the state statutory scheme being challenged. *Railroad Comm'n* v. *Pullman Co.*, 312 U. S. 496. The state-court construction may obviate or significantly modify the federal questions seemingly presented, thus avoiding "unnecessary friction in federal-state relations, interference with important state functions, tentative decisions on questions of state law, and premature constitutional adjudication." *Harman* v. *Forssenius*, 380 U. S. 528, 534. Those considerations were sacrificed here, when the District Court nevertheless proceeded to measure the ambigu-

---

*The record suggests that the courts of New York City may apply the statutes in question in quite a different manner.

ous provisions of state law against the Due Process Clause of the Fourteenth Amendment.

Even though the prerequisites of *Pullman* abstention are clearly met in this case, the Court rejects a routine application of that established doctrine in favor of a novel extension of the *Younger-Huffman* line of "abstention" cases. *Younger* v. *Harris*, 401 U. S. 37; *Huffman* v. *Pursue, Ltd.*, 420 U. S. 592. That is a departure from prior cases, which have not reached the *Younger* question when grounds for *Pullman* abstention were clear. See, *e. g., Carey* v. *Sugar*, 425 U. S. 73; *Harrison* v. *NAACP*, 360 U. S. 167.

Both types of "abstention," of course, serve the common goal of judicial restraint as a means of avoiding undue federal interference with state goals and functions. But there is a significant difference in result between the two. Under *Pullman* abstention, the federal court may retain jurisdiction pending state-court interpretation of an ambiguous statute, while under *Younger* it may not. The *Pullman* approach thus has the advantage of not altogether foreclosing access to federal courts to vindicate federal rights, while still avoiding needless friction in federal-state relations.

Viewing this case as a paradigm for *Pullman* abstention, I would set aside the judgment of the District Court and direct it to retain jurisdiction pending a definitive construction of the statutes in question by the courts of New York.