John S. ROSKO, Plaintiff,

v.

Clinton L. PAGANO, Individually and as Superintendent of the New Jersey Division of State Police, Defendant.

Civ. No. 79–302.

United States District Court,
D. New Jersey.

March 14, 1979.

Mason, Griffin & Pierson, Princeton, N. J. by Donald M. Altman, Russell W. Annich, Jr., Princeton, N. J., for plaintiff.

John J. Degnan, Atty. Gen. of N. J. by Michael R. Cole, Deputy Atty. Gen., Trenton, N. J., for defendant.

## OPINION

CLARKSON S. FISHER, Chief Judge.

The extent to which a federal court may intrude into the internal disciplinary functions of the New Jersey Division of State Police (the Division) by way of the Civil Rights Act is the keynote of this case. The trial of this action on the merits was advanced and consolidated with the hearing on the application for preliminary injunctive relief, pursuant to Fed.R.Civ.P. 65(a)(2). The following are the findings of fact and conclusions of law mandated by Fed.R.Civ.P. 52(a).

The Division exists within the Department of Law and Public Safety, which is under the control of the Attorney General, and part of the Executive Branch of New Jersey Government. N.J.S.A. 52:17B–1 *et seq.* Defendant is Superintendent of the Division and holds the rank of Colonel. Plaintiff is a Lieutenant of State Police with twenty-six years service. On June 15, 1978, pursuant to Article II, § 2 of State Police Rules and Regulations, (Regs.), plaintiff was suspended without pay or benefits pending the filing of administrative disciplinary charges against him. On August 3, 1978, formal charges were preferred against Rosko to which he pleaded not guilty. Those charges[1] allege in substance that he

---

1. The events material to the charges occurred from the late Spring through the Fall of 1977. The Division revised its Regs. effective August 1, 1977, so there are two separate sets of charges against Rosko. The first, under Regs. in effect prior to August 1, 1977, charges violation of section 19, paragraph 23, which provides

> No member . . . shall demean himself in any disorderly or neglectful manner, or to the prejudice of good order and discipline, or in a manner to bring discredit upon the Department.

The second set under new Regs. charges (1) violation of Article XIII, § 22, which provides

> No member shall induce or attempt to induce any other member to violate any section of this Article.

> In addition to a violation of this Article being cause for discipline of a member, it should be recognized by every member that the inducing or attempt to induce any member to violate this Article by another member or any other person, will subject such member or person to prosecution as a disorderly person;

wrongfully obtained and distributed a copy of the background investigation of Joseph Lordi (the Report), which the State Police had conducted in mid-1977 at the direction of the Attorney General.

The Governor had ordered the Attorney General to make an inquiry into Lordi's fitness to serve as Chairman of the Casino Control Committee. See N.J.S.A. 5:12–52(d) (1978 Supp.) [2] Following the investigation, the Governor announced the nomination of Lordi to chair the Committee.

As the State Senate was obliged to advise and consent with respect to the nomination, the Senate Judiciary Committee held hearings in July 1977. Senator Parker, a member of the Judiciary Committee, explained that although they were aware of the existence of the Report, members of the Judiciary Committee were not permitted to see that document.[3] Except for a limited number of authorized Division personnel, only the Attorney General and the Governor were supposed to have access to the Report.

During the Lordi hearings, defendant was questioned about the contents of the Report. Pagano had not been summoned to the hearings but just happened by in connection with another inquiry. In response to Parker's questions, defendant told the Judiciary Committee that there was nothing in the Report which, in his judgment, would disqualify Lordi. The nomination eventually was reported out of Committee and Lordi was confirmed by the Senate on July 25, 1977.

Subsequently Senator Parker became concerned with the accuracy of Pagano's testimony before the Judiciary Committee, because of the news media's attention to the Lordi nomination. Especially important in this regard was an article authored by John McLaughlin which appeared in the October 21, 1977 issue of the New York Daily News. The McLaughlin piece described certain aspects of the Lordi Report in a detail which indicated intimate knowledge of its contents, and inferentially impugned the propriety of Lordi holding the sensitive post. I have not read the Report, but defendant concedes the fundamental accuracy of the media treatment of it. McLaughlin's article piqued the curiosity of others besides Senator Parker. Shortly after the story appeared, the State Police undertook an intensive investigation into the source of the leak of the Report. It is as a result of that investigation, which employed the State Grand Jury and which could have led to criminal charges, that plaintiff stands accused before the Division.[4]

In a proceeding before Honorable George Y. Schoch, Assignment Judge of Mercer County, Rosko testified under oath that he secured a copy of the Lordi Report from a fellow officer sometime in July or August of 1977. Plaintiff also admitted that he gave a copy of the Report to State Senator Raymond Bateman on September 7, 1977, in

(2) violation of Article XIII, § 19(c), which provides

A member shall:

c. Not disseminate, distribute or supply to any unauthorized member or any other person, an original, copy or abstract of any Division document, unless specifically authorized by competent Division authority;

(3) violation of Article VI, § 2(a) and (c), which provides

No member shall:

a. Act or behave in an official capacity to the personal discredit of the member or to the discredit of the Division.

c. Act or behave in any capacity to the detriment of good order and discipline of the Division.

**2.** The Casino Control Act states

Appointments to the Commission shall be made by the Governor with the advice and consent of the Senate. Prior to nomination, the Governor shall cause an inquiry to be conducted by the Attorney General into the nominee's background, with particular regard to the nominee's financial stability, integrity, and responsibility and his reputation for good character, honesty and integrity. N.J.S.A. 5:12–52(d).

**3.** A rule change proposed by Senator Parker, which would have made State Police background investigations of candidates for public office available to the Judiciary Committee, was voted down by the Senate.

**4.** As of this writing, criminal charges have not been filed against the principals assertedly responsible for the distribution of the Report.

a meeting at Bateman's home. Senator Bateman was then the Republican gubernatorial candidate, and was also a member of the Senate Judiciary Committee. Rosko did not request and was not promised any political favor by Bateman in exchange for the Report; in fact, at that time the Senator did not even know Rosko's name. The Report eventually made its way to the media through the Bateman organization, without Bateman's knowledge.

Senator Parker insisted that if he had been made aware at the Judiciary Committee hearing of the information which the McLaughlin article said the Lordi Report contained, he would have voted against the nomination. One could certainly speculate that full disclosure of the contents of the Report may have had similar effects on enough Judiciary Committee members so as to defeat Lordi's nomination. Senator Parker's vociferous criticism of Pagano's alleged failure to fully explain the Report to the Judiciary Committee was reported in the newspapers on at least two separate occasions. In the October 27, 1977 issue of the Trenton Times, Parker is reported to have claimed that Pagano deliberately misled the Judiciary Committee. In the December 12, 1978 issue of the Trenton Times, Parker is said to have stated that when he questioned defendant about Lordi, defendant failed to explain the substance of the Report. Parker testified as to the truth of his statements and that he in fact made them. Pagano was aware of the media attention given these unfavorable comments.

It is appropriate at this point to outline the operation of a State Police General Disciplinary Hearing, which plaintiff would have undergone on February 12, 1979 but for temporary restraining orders entered February 5. The Division member charged is entitled to legal counsel; he may call witnesses in his behalf and cross examine opposition witnesses; and he can secure Division records relevant to the charges at least five days in advance of the hearing. The Superintendent or his designee, who must be a Commissioned Officer of higher rank than the trooper charged, sits as Hearing Officer in the matter. All proceedings are to be tape recorded, unless the member makes arrangements to bear the cost of a certified shorthand reporter. Although hearings are generally closed, the parties have agreed that the hearing in Rosko's case may be open to the public.

The rules of evidence do not apply; instead, all relevant evidence is admissible. The Hearing Officer should recognize the rules of privilege, and may take judicial notice of certain facts. The parties have the right to examine and contest the material to be noticed.

When the Hearing Officer is the Superintendent's designee, he shall file his recommended report and decision containing findings of fact, conclusions of law, and suggested discipline within forty-five days of conclusion of the hearing. The parties then have twenty days to file written objections to the recommendations, or may request permission to present argument to the Superintendent. Within forty-five days after expiration of the twenty day period, or forty-five days after conclusion of the hearing, if it is conducted by the Superintendent, the Superintendent shall render final judgment in the matter. The decision must include findings of fact, conclusions of law, and the discipline to be imposed. Possible sanctions range from reduction in rank or grade to suspension from duty with forfeiture of pay and benefits to outright dismissal.

Although defendant appointed Lieutenant Colonel Quinn as Hearing Officer in this matter, there is a question whether Quinn's impending retirement will allow him to serve. Quinn has ruled that he will not consider issues of constitutional dimension in the hearing; however, much of Rosko's defense is based on the First Amendment. N.J.Court Rule 2:2–4 allows interlocutory appeals from the Hearing Officer's interim rulings, while R. 2:2–3(a) grants Rosko the right to appeal to the Superior Court, Appellate Division, from an adverse final decision.

A story appeared in the January 5, 1979 issue of the Newark Star Ledger, in which

Pagano is quoted as saying that plaintiff's reason for giving Bateman the Report was to

> help him (Rosko) get a political leg up. He hoped to get an edge where no one has a right to.

The reporter who wrote the story testified to the accuracy of the quotation. Defendant admitted that the article accurately reflected a portion of his conversation with the reporter, but claimed that the quote is merely a paraphrase. A key element of Rosko's defense is that he acted in good faith and mainly in the public interest in attempting to bring to the attention of the Judiciary Committee all of the facts bearing on the propriety of the Lordi appointment. Defendant testified that he has no preconceived notion of either plaintiff's total motivation for dissemination, or of Rosko's guilt or innocence. Since the fact of dissemination has been admitted, the viability of Rosko's good faith defense as a factor mitigating punishment is crucial. Plaintiff is naturally concerned that the person who will make the final decision in his disciplinary matter has publicly expressed an opinion adverse to a critical part of his defense prior to commencement of the hearing.

Plaintiff has suggested that the investigation into the source of the leak and the subsequent disciplinary proceeding were brought to harass him, and in retaliation for his exercise of First Amendment rights. Despite Senator Bateman's characterization of the investigation as "overkill", this is not borne out by the facts. There is no proof that the investigation was initiated and carried out for any purpose other than to uncover a serious security leak within the Division. Nor is there any proof that disciplinary charges were brought for any reason other than to punish a breach of Division Regulations.

A related matter is presently pending in the Appellate Division of Superior Court. Plaintiff was given certain Division records, including a copy of the Report, for use in connection with his defense. On August 21, 1978 defendant obtained a Protective Order from Judge Schoch which restrained plaintiff from distributing any Division documents beyond the scope of his need for them in the disciplinary hearing. Plaintiff's motion to modify that order was denied, and the propriety of the Protective Order is the subject of the pending appeal. An issue on that appeal is whether the Report is a public record within the meaning of the Right to Know Law, N.J.S.A. 47:1A–2 (1978 Supp.).[5] That same issue has a great deal of relevance to plaintiff's First Amendment claim in this Court.

Upon reading the verified complaint the Court ordered defendant to show cause on February 5, 1979 why a preliminary injunction should not issue restraining the commencement of the disciplinary hearing scheduled for February 12. I heard argument on February 5 and entered two successive ten day orders temporarily restraining the conduct of the hearing until after proofs could be presented.

This action is brought pursuant to 42 U.S.C. § 1983 and 28 U.S.C. § 2201. I have jurisdiction under 28 U.S.C. § 1343(3), not-

---

5. That statute reads in pertinent part:

Except as otherwise provided in this act or by any other statute, resolution of either or both houses of the Legislature, executive order of the Governor, rule of court, any Federal law, regulation or order, or by any regulation promulgated under the authority of any statute or executive order of the Governor, all records which are required by law to be made, maintained or kept on file by any board, body, agency, department, commission or official of the State or of any political subdivision thereof or by any public board, body, commission or authority created pursuant to law by the State or any of its political subdivisions, or by any official acting for or on behalf thereof (each of which is hereinafter referred to as the "custodian" thereof) shall, for the purposes of this act, be deemed to be public records. Every citizen of this State, during the regular business hours maintained by the custodian of any such records, shall have the right to inspect such records. Every citizen of this State shall also have the right, during such regular business hours and under the supervision of a representative of the custodian, to copy such records by hand, and shall also have the right to purchase copies of such records.

Public records are to be "readily accessible" to State citizens. N.J.S.A. 47:1A–1 (1978 Supp.)

withstanding defendant's suggestion to the contrary. Plaintiff seeks declaratory and injunctive relief:

(a) restraining defendant from proceeding with the disciplinary hearing;

(b) declaring the State Police Regulations governing the administrative disciplinary process unconstitutional as applied to plaintiff's conduct;

(c) ordering his suspension terminated and reimbursing withheld pay and benefits; and

(d) restraining defendant from impeding plaintiff in his exercise of the right of free expression.

Plaintiff relies on two distinct but related theories. First, he asserts that Pagano's control over the Hearing Officer and his position as ultimate arbiter preclude plaintiff's receiving a fair and impartial hearing, and so denies him due process of law. Second, Rosko contends that he lawfully exercised his First Amendment rights of free expression and to petition elected representatives for redress of grievances, in making a copy of the Report available to Senator Bateman. Plaintiff insists this First Amendment right is buttressed by a concomitant right to act in the public interest to ensure the appointment of only qualified persons to offices of public trust. Since, in plaintiff's estimation, the Report called into question Lordi's fitness to serve as Chairman of the Casino Control Committee, Rosko felt duty bound to bring the derogatory information to the attention of an individual in a position to attempt to rectify the situation.

■ Only when an independent source of subject matter jurisdiction exists is it permissible to proceed contemporaneously under the Declaratory Judgment Act, 28 U.S.C. § 2201 (1978 Supp.). Ordinarily where a litigant seeks declaratory and injunctive relief, the propriety of the issuance of each remedy must be considered separately. *Zwickler v. Koota,* 389 U.S. 241, 254, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967). However, where there is a pending state proceeding which would be disrupted by an injunction

the same equitable principles relevant to the propriety of an injunction must be taken into consideration . . . in determining whether to issue a declaratory judgment.

*Samuels v. Mackell,* 401 U.S. 66, 73, 91 S.Ct. 764, 768, 27 L.Ed.2d 688 (1971).

Defendant contends that notions of equity, comity and federalism require me to abstain from interfering in the pending State Police disciplinary proceeding, under *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), or *Railroad Commission v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). Defendant concedes that the right to a fair and impartial tribunal is a basic requirement of due process, *e. g. Goldberg v. Kelly,* 397 U.S. 254, 271, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), but asserts that plaintiff has not overcome the presumption of the decision-maker's honesty and integrity. *See Hortonville Dist. v. Hortonville Education Assn.,* 426 U.S. 482, 497, 96 S.Ct. 2308, 49 L.Ed.2d 1 (1976).

■ *Younger* abstention presupposes an opportunity for plaintiff to present his federal claims to a competent state tribunal. *Gibson v. Berryhill,* 411 U.S. 564, 577, 93 S.Ct. 1689, 36 L.Ed.2d 488 (1973). One of the principal reasons for abstention, that the states should be allowed to provide a forum for presentation of constitutional issues, evaporates in a situation where the decision-maker is biased or the probability of bias "is too high to be constitutionally tolerable." *Withrow v. Larkin,* 421 U.S. 35, 47, 95 S.Ct. 1456, 1464, 43 L.Ed.2d 712 (1975).

■ Under Division Regulations defendant may either hear the matter himself or designate one of his subordinates as Hearing Officer. In any event, Pagano is the ultimate decision-maker. I acknowledge that in order for the Division to function smoothly, internal disciplinary procedures should be under the control of the Superintendent. But in the context of this case it is constitutionally impermissible for either

defendant or his designee to conduct the Rosko disciplinary hearing, or for defendant to sit in final administrative judgment.

Pagano has admitted that he feels that a partial, if not the major factor influencing plaintiff's decision to circulate the Report was the possibility of personal gain. However, a central element of plaintiff's defense to the disciplinary proceeding will be his good faith belief that he was acting in the public interest. I cannot permit defendant, or a subordinate subject to his influence, to have the initial factfinding responsibility in the matter of Rosko's discipline. The risk of unfairness because of defendant's admitted predisposition is just too great. This risk does not appreciably lessen even if his designee, and not Pagano, sits as Hearing Officer, because of the reality of command influence in a paramilitary organization like the Division. An impartial arbiter from outside the Division must sit as Hearing Officer in this case. In order to expedite the installation of an unbiased decision-maker, and pursuant to N.J.S.A. 52:14F–8 (1978 N.J. Session Law Service, No. 3), defendant is directed to request the Director of the Office of Administrative Law to assign a judge to preside over the Rosko hearing. Nor may Pagano issue the final decision upon the Administrative Law Judge's (ALJ) report and recommendation, since merely interposing an ALJ does not sufficiently insulate Rosko's right to due process of law. Although the ALJ will be able to fully and fairly develop the factual record free from adverse influence, and probably will be better suited than a Division member to form conclusions of law, see N.J.S.A. 52:14F–5(*l*), these procedural protections may very well be rendered nugatory if Pagano is left to exercise the ultimate decisional authority. To avoid any inherent problem here discussed Pagano will be replaced in the decision-making role in the disciplinary process. Since the Division is part of the Department of Law and Public Safety, the Attorney General appears to be the person best suited to fill Pagano's role in the context of this case. In the final analysis, this solution accommodates plaintiff's constitutional rights without ignoring the need for centralization of Division disciplinary functions.

Apart from the above facial bias on the part of defendant, another reason impels me to require the appointment of a Hearing Officer from without the Division. Defendant has been the target of personal abuse or criticism because of the conduct of the party whose guilt he (or his designee) must decide. *See Withrow v. Larkin,* 421 U.S. at 47, 95 S.Ct. 1456. The sharp rebukes levelled at Pagano by Senator Parker were addressed to what Parker perceived as Pagano's failure to be candid under questioning about the contents of the Report. Rosko gave the Report to Bateman, and from there it made its way to the news media; Parker's reaction was provoked by the media attention. Although the disparagement did not flow directly from Rosko, defendant knows that it was causally related to Rosko's conduct in disseminating the Report. It is that conduct which forms the basis of the charges against plaintiff. That defendant has been personally stung as a result of the very action upon which he now sits in judgment creates too great a risk that he, or his subordinate, will lack that "calm detachment necessary for fair adjudication." *Mayberry v. Pennsylvania,* 400 U.S. 455, 465, 91 S.Ct. 499, 505, 27 L.Ed.2d 532 (1971). In this regard, one cannot overlook the possibility that apart from the "command influence" exerted by Pagano, the judgment of a Division member sitting as Hearing Officer could be improperly affected by his resentment at the unfavorable publicity received by the State Police in connection with this case. Assignment of an ALJ avoids those problems.

In sum, my reaction to plaintiff's claim that he will be denied due process by continuation of the disciplinary proceedings is limited to insuring that deprivation does not occur. If defendant refuses to install an ALJ, I will permanently enjoin the hearing, order plaintiff restored to active status, and require payment of benefits and salary from the date of his original suspension.

Once the threat to Rosko's constitutional right to due process is removed, I must

decide whether to proceed to judgment on the merits. Plaintiff challenges the constitutionality of a state rule [6] and seeks to have state officers enjoined from enforcing it. However, a proceeding has already been instituted in the state system to enforce the challenged rule against the federal plaintiff. If plaintiff could tender and have his federal claim decided in the state proceeding then abstention is proper, absent a showing of bad faith or harassment in bringing the state action, flagrant unconstitutionality of the state rule or statute, or other extraordinary circumstances. *Trainor v. Hernandez*, 431 U.S. 434, 441–42, 97 S.Ct. 1911, 52 L.Ed.2d 486 (1977); *Juidice v. Vail*, 430 U.S. 327, 334, 97 S.Ct. 1211, 51 L.Ed.2d 376 (1977); *Younger v. Harris, supra.*

■ Application of the principles underlying abstention has been expanded beyond state criminal prosecutions, to reach a civil suit against "those in charge of an executive branch of an agency of state or local governments." *Rizzo v. Goode*, 423 U.S. 362, 380, 96 S.Ct. 598, 608, 46 L.Ed.2d 561 (1976). Classification of the state action as civil or criminal is no longer of controlling significance, *Johnson v. Kelly*, 583 F.2d 1242, 1248 (3d Cir. 1978). Rather, the strength of the State's interest in unrestrained performance of a legitimate governmental function as a means of effectuating its policy has been identified as the central consideration in an analysis of the propriety of abstention. *Trainor*, 431 U.S. at 444, 97 S.Ct. 1911; *id.*, at 448, 97 S.Ct. 1911 (Blackmun, J., concurring); *New Jersey Education Association v. Burke*, 579 F.2d 764, 768 (3d Cir.), *cert. denied*, —— U.S. ——, 99 S.Ct. 252, 58 L.Ed.2d 239 (1978); *see Gipson v. New Jersey Supreme Court*, 558 F.2d 701, 703–04 (3d Cir. 1977). As a natural corollary to the requirement that the State's interest be substantial, abstention is improper unless the state proceeding has been initiated by the state itself, *Johnson v. Kelly*, 583 F.2d at 1249.

■ The State's interest in the conduct of Rosko's administrative disciplinary hearing is sufficiently weighty to require abstention. The charges flow from the executive branch of the State, through the Division, and are for all intents and purposes brought by the State. Furthermore, the State had the option of proceeding criminally as well as civilly, and in fact plaintiff admits that the investigation of the leak was conducted with a view toward securing a criminal indictment against the persons responsible.

To promote the autonomy of the Division, the Legislature has delegated to the Superintendent the power to make rules to govern the State Police, N.J.S.A. 53:1–10. For the Division to function smoothly, the Superintendent must have the ability, without untoward interference, to punish those who violate those rules. A disciplinary hearing brought pursuant to Regulations, with adequate procedural protections, fosters departmental morale and discipline and reinforces the objective legitimacy of the Division's role in State government. The State's concern in the effective operation of its premiere law enforcement agency is on the same level as the interests respected in *Trainor, Juidice* and *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975), *reh. denied* 421 U.S. 971, 95 S.Ct. 1969, 44 L.Ed.2d 463 (1975).

Other reasons justifying further intervention are not present here. Plaintiff has not shown that the disciplinary proceeding was instituted in bad faith, or without a reasonable chance to obtain conviction, *see Perez v. Ledesma*, 401 U.S. 82, 91 S.Ct. 674, 27 L.Ed.2d 701 (1971). Although the investigation and disciplinary process may have inconvenienced plaintiff, there is no showing of harassment. N.J.S.A. 53:1–10 and the Rules and Regulations promulgated pursuant thereto are not flagrantly unconstitutional; indeed, they are attacked in their application to plaintiff. No other extraordinary circumstances exist to support a further exercise of this Court's injunctive power.

---

**6.** The Division Rules and Regulations were promulgated by the Superintendent pursuant to N.J.S.A. 53:1–10, and were approved by Governor Byrne.

Plaintiff conceded at trial that he will be able to raise his First Amendment claims in a state forum during the course of adjudication of the charges.[7] That plaintiff will have an *opportunity* to raise federal constitutional claims in the state proceeding is sufficient in determining whether to abstain. *Juidice v. Vail,* 430 U.S. at 337, 97 S.Ct. 1211; *Gibson v. Berryhill,* 411 U.S. at 577, 93 S.Ct. 1689. Since my limited intrusion into the state system ensures the credibility of the initial forum, I must refrain from further interference.

■ An alternative reason for my reluctance to reach the merits of plaintiff's First Amendment claim is the principle of restraint which takes its name from *Railroad Commission of Texas v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). There are three prerequisites to application of this doctrine: (1) uncertain issues of state law underlying the federal constitutional claim; (2) a state court decision on those issues would "obviate the need for or substantially narrow the scope of the adjudication of the constitutional claims;" and (3) "an erroneous decision of state law by the federal court would be disruptive of important state policies." *D'Iorio v. County of Delaware,* 592 F.2d 681 at 686, (3d Cir. 1978). Once the three prerequisites are found to exist, abstention is generally proper. *D'Iorio,* at 692.

■ The first element of the formula is present, since the key question underlying plaintiff's First Amendment claim here is that of the Report's confidential status. Plaintiff admits in his brief that the classification of the Report as confidential *vel non* is *the* issue pending on appeal from Judge Schoch's protective order. That these issues are uncertain is clear from analysis of the relevant state statutory and case law.

The Casino Control Act mandates an "inquiry" into a prospective nominee's background. N.J.S.A. 5:12–52(d). Whether the Lordi Report is included within the meaning of "inquiry" has not been decided by any state court. The Report's status as an "inquiry" is in turn crucial to whether it is a "public record" under the Right to Know Law, N.J.S.A. 47:1A–2 (1978 Supp.) so as to take this case beyond the authority of *Nero v. Hyland,* 76 N.J. 213, 220, 386 A.2d 846 (1978).[8] If the Report is not a public record, plaintiff's First Amendment theory may be fatally undercut, *see United States v. Marchetti,* 466 F.2d 1309, 1317 (4th Cir.), *cert. denied,* 409 U.S. 1063, 93 S.Ct. 553, 34 L.Ed.2d 516 (1972); *Knopf v. Colby,* 509 F.2d 1362, 1370 (4th Cir.), *cert. denied,* 421 U.S. 992, 95 S.Ct. 1999, 44 L.Ed.2d 482 (1975), *reh. denied,* 422 U.S. 1049, 95 S.Ct. 2669, 45 L.Ed.2d 702 (1975),[9] thus satisfying the second prong of the test.

Were I to proceed to decide the status of the Report, it would impact on the important areas of the scope of state government executive privilege, and the role of the At-

---

7. Installation of an ALJ should allow constitutional issues to be raised and decided at the initial hearing. Even if the hearing judge does not consider constitutional claims, those issues should be noted and factual presentations relevant to them should be made to ensure an adequate record for appellate review. "In this way both the integrity of the administrative system and . . . [plaintiff's] . . . right to a judicial determination of constitutional issues will be preserved." *Paterson Redevelopment Agency v. Schulman,* 78 N.J. 378, 388, 396 A.2d 573, 578 (1979).

8. *Nero* held that character investigations made at the behest of the Governor in connection with a contemplated nomination are not public records. 76 N.J. at 220, 386 A.2d 846. In that case, however, the Governor was not directed to make an inquiry by statute. I also hesitate

to determine whether either New Jersey Governor Executive Order 48, providing for restrictions on distribution of Division records, or Art. 13 § 19 of Division Regs., except the Report from the ambit of the Right to Know Law.

9. Plaintiff swore to uphold Division Rules and Regulations when he became a member. Article 13, ¶ 19 of the Regulations establishes the confidentiality of Division documents, and proscribes their distribution to any unauthorized person. In an analogous context, the Fourth Circuit has indicated an ex-C.I.A. agent may relinquish his First Amendment right to disseminate confidential Agency information acquired during the course of employment, where the agent entered into a valid secrecy agreement. *Knopf,* 509 F.2d at 1370.

torney General and of the State Police in policy-making and intelligence gathering. Construction of the Casino Control Act and the Right to Know Law are matters for the state courts.

The parties shall submit an order of judgment, consented to as to form, and consistent with this opinion, within ten days.