**WOMEN'S COMMUNITY HEALTH CENTER OF BEAUMONT, INC., et al., Plaintiffs-Appellants,**

v.

**TEXAS HEALTH FACILITIES COMMISSION, et al., Defendants-Appellees.**

No. 81–1180.

United States Court of Appeals, Fifth Circuit.

Sept. 15, 1982.

Lucas & Miller, Roy Lucas, Washington, D. C., for plaintiffs-appellants.

Nancy N. Lynch, Asst. Atty. Gen., Austin, Tex., for defendants-appellees.

Before THORNBERRY, REAVLEY and RANDALL, Circuit Judges.

REAVLEY, Circuit Judge:

The question presented is whether the *Younger* doctrine bars this action for declaratory and injunctive relief against the state's attempt to enforce the "certificate of need" requirements of the Texas Health Planning Act (the "State Act"), Tex.Rev. Civ.Stat.Ann. art. 4418h (Vernon 1976 & Supp.1982), and the National Health Planning and Resources Development Act of 1974 (the "Federal Act"), 42 U.S.C.A. §§ 300k to 300n-6 (West Supp.1982). We conclude that it does and affirm the judgment of the district court.

## I. History of the Litigation

The Women's Community Health Center, a medical facility offering first trimester abortions, pregnancy counseling, and related health care, opened in Beaumont, Texas, in October 1978. On December 15, 1978, the Texas Health Facilities Commission (the "Commission") notified the Center that it appeared to be operating in violation of the State Act. That Act requires a person to obtain a "certificate of need" from the Commission before opening a "health care facility."[1] The Center had not applied for a certificate of need.

On July 10, 1979, the Commission filed an action against the Center in state district court in Beaumont, asking the court to enjoin the Center from operating "unless and until the Center obtains a Certificate of Need from the ... Commission." The Commission's petition alleged that despite repeated assurances from the Center, including a promise that the application for a certificate of need would be filed within 15 days of March 15, 1979, the Center had failed to file its application for a certificate of need.[2]

The Center eventually filed an application in late July 1979. The Commission thereafter ceased active pursuit of the injunction and instead commenced administrative proceedings on the Center's application. Nevertheless, the enforcement action was not dismissed; it remained (and remains) pending in state court.

After accepting the Center's application for a certificate of need in January 1980,[3] the Commission referred the application to the Greater East Texas Health Systems Agency ("GETHSA"), the "health systems agency" created by the Federal Act, and charged by that Act with improving health care in the Center's locality. *See* 42 U.S. C.A. §§ 300*l*-1(b)(1), 300*l*-2(a) (West Supp. 1982).[4] In late February 1980, GETHSA recommended to the Commission that the Center's application be approved.[5]

In March 1980, the Commission conducted a public hearing on the Center's application. The hearing officer found, *inter alia*, that the Center was "not necessary to meet the health care requirements of the medical

---

1. The Act requires a certificate of need for "a proposed project to ... offer a new institutional health-care service." Tex.Rev.Civ.Stat.Ann. art. 4418h, § 3.01(a)(2) (Vernon Supp.1982). "Institutional health-care services" are defined as "services provided in health-care facilities." *Id.* § 1.03(12). The definition of "health-care facility" is extremely broad, but excepts "the office of physicians or practitioners of the healing arts singly or in groups in the conduct of their profession." *Id.* § 1.03(9).

2. The Center had filed a ·notice of intent to apply for a certificate of need on March 16, 1979.

3. Apparently, the Center was required to resubmit its application twice. The record and briefs are silent on the reasons for these resubmissions.

4. This reference was required by the Federal Act. 42 U.S.C.A. §§ 300*l*-2(f), 300m-6(g) (West Supp.1982).

5. GETHSA found that there was a need for the Center because "[t]here are no other facilities ... providing first trimester elective pregnancy termination services in the medical service area .... Patients must travel to Houston or Dallas to obtain similar services."
 Under the Federal Act, the Commission must consider "recommendations made by health systems agencies." 42 U.S.C.A. §§ 300m-2(a)(4)(B), 300m-6(g) (West Supp.1982).

service area," that the Center would "adversely affect, [would] unnecessarily and uneconomically duplicate and [would] not integrate with existing health care facilities and services presently offered in the medical service area," and that the Center was "not less costly, more effective, and more appropriate than other facilities or services which are available." Accepting these fact findings, the Commission denied the Center's application on August 1, 1980. In denying the Center's motion for a rehearing on September 12, 1980, the Commission also found that the Center had been violating the State Act by operating without a certificate of need and "request[ed] the Attorney General of Texas to continue the legal action already instituted [in Beaumont] against the Center to enjoin a continuing violation of the ... Act."

On October 9, 1980, the Center and the other appellants—two medical doctors and three pregnant women—brought this action in the United States district court against the Commission, its members, and the Attorney General of Texas. Six days later, the Center filed a second action in state district court: a petition to review the decision of the Commission. The appellants aver that the petition "was filed solely as a protective appeal to guard against a state statute of limitations"; the Center moved to stay that appeal on the same day it was filed.[6]

In March 1981, the federal district court granted defendants' motion to dismiss. Thereafter, plaintiffs filed their notice of appeal. The defendant Commission filed an amended petition in its enforcement proceeding in the state district court, renewing its request for an injunction against the Center's continuing operation. The state district court stayed the enforcement action pending our decision of this appeal.

■■■ Throughout these proceedings, the Center has remained open and has continued to perform first trimester abortions.[7]

## II. Abstention

### A. Nature of the Plaintiffs' Claim

The plaintiffs do not claim that a "health-care facility" that performs first trimester abortions cannot constitutionally be required to obtain a certificate of need. Instead, plaintiffs' federal claim is that de-

---

**6.** The record does not reveal whether the stay was ever granted. It is clear, however, that the Center has not prosecuted its appeal.

**7.** This fact led the district court to dismiss on the ground that this case was not yet ripe for adjudication. Defendants had never urged ripeness as a ground for dismissal; they had relied primarily on the abstention doctrines. To the extent that the district court decided that there was no "case or controversy" in the sense required by Article III of the Constitution, the court's conclusion was in error. A constitutional challenge is ripe in the jurisdictional sense if there is a real threat that the statute will be enforced against the plaintiff. See, e.g., Steffel v. Thompson, 415 U.S. 452, 458–59, 94 S.Ct. 1209, 1215–16, 39 L.Ed.2d 505 (1974). In this case, there was not only a real threat of enforcement, but actual enforcement efforts. We need not decide whether the district court was correct in finding this case unripe in the discretionary sense of the term, see generally 13 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 3532 (1975), because we affirm the dismissal on other grounds.

We do question, however, whether the claims of the once-pregnant women still present an actual "case or controversy." While infringe-

ments of the right to an abortion are within the "capable of repetition, yet evading review" exception to the mootness doctrine, Roe v. Wade, 410 U.S. 113, 125, 93 S.Ct. 705, 713, 35 L.Ed.2d 147 (1973), it is clear that the terms of the pregnancies alleged in the complaint have long since passed and that the alleged infringement of the women's rights—the closing of the Center—has not occurred. Cf. id. at 127–29, 93 S.Ct. at 714–15 (holding that plaintiff could not base standing on possible future pregnancy and inability to obtain legal abortion).

We need not decide whether these plaintiffs have a live case or controversy. We have Article III jurisdiction over the parallel claims of the Center and the physicians. Since we conclude that we must dismiss those claims without reaching the merits, it is clear that the claims of the women must likewise be dismissed. Cf. General Bldg. Contractors Ass'n, Inc. v. Pennsylvania, —— U.S. ——, 102 S.Ct. 3141, 3156 n.22, 73 L.Ed.2d 835 (1982) (finding it unnecessary to consider Article III standing of one plaintiff when other plaintiffs have standing and determination not essential to Court's decision).

fendants have attempted to apply the certificate of need requirement to the Center in a discriminatory fashion, thereby transgressing the constitutional limitations on the state's power to regulate first trimester abortions established in *Roe v. Wade*, 410 U.S. 113, 163–64, 93 S.Ct. 705, 731–32, 35 L.Ed.2d 147 (1973). Plaintiffs argue that the defendants have made the "arbitrary and capricious" determinations (1) that the Center is a "health-care facility" as defined in the State Act and (2) that the Center is not entitled to a certificate of need. Plaintiffs also append the state law claim on which this federal constitutional claim logically rests—that the Commission's actions were arbitrary and capricious, contrary to the State Act, and not supported by substantial evidence in the record. Should the court conclude that the Commission's actions conformed to the State Act, however, the plaintiffs advance a supremacy clause claim: they argue that the Commission's application of the State Act is contrary to the Federal Act which it implements. *See* Tex.Rev.Civ.Stat.Ann. art. 4418h, § 1.02 (Vernon 1982).[8]

Plaintiffs sought, *inter alia*, declaratory relief in accord with these arguments, and an injunction either (1) restraining the Commission from requiring a certificate of need, or (2) directing the Commission to grant a certificate of need. They further requested a preliminary injunction to restrain the defendants from enforcing the certificate of need requirement. Such relief would, of course, bar the state from prosecuting its enforcement proceeding in state district court.

---

**8.** Given the nature of plaintiffs' claims, defendants argue that plaintiffs are essentially seeking review of a state administrative proceeding. They argue that abstention is proper under *Railroad Comm'n v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), because a resolution of the state law issues in plaintiffs' favor would make federal court determination of the constitutional issues unnecessary. We do not reach this issue because we find that abstention was proper on other grounds.

**9.** Despite this line of cases, plaintiffs argue that *Younger* applies only when the state proceeding is "in aid of" a criminal statute. For this proposition they rely on *Gresham Park Com-*

### B. *The Younger Doctrine*

In a series of cases beginning with *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), the Supreme Court has "espouse[d] a strong federal policy against federal court interference with pending state judicial proceedings absent extraordinary circumstances." *Middlesex County Ethics Comm. v. Garden State Bar Ass'n*, —— U.S. ——, 102 S.Ct. 2515, 2521, 73 L.Ed.2d 116 (1982). While it was once thought that *Younger* applied only to state criminal or· "quasi-criminal" proceedings, the Court has now made it clear that "[t]he policies underlying *Younger* are fully applicable to noncriminal judicial proceedings when important state interests are involved." 102 S.Ct. at 2521. The Court has held that federal courts should abstain from considering constitutional challenges when a state has initiated disciplinary proceedings against the attorney-plaintiff, *id.* at 2524, when the state has filed a proceeding to terminate the parental rights of the plaintiffs for alleged child abuse, *Moore v. Sims*, 442 U.S. 415, 423, 99 S.Ct. 2371, 2377, 60 L.Ed.2d 994 (1979), when the state has brought a civil enforcement action for return of fraudulently obtained welfare payments, *Trainor v. Hernandez*, 431 U.S. 434, 435–36, 444, 97 S.Ct. 1911, 1914, 1918, 52 L.Ed.2d 486 (1977), and when a state judge has imposed civil contempt sanctions on a party to private litigation who has ignored state court orders, *Juidice v. Vail*, 430 U.S. 327, 329–30, 334–36, 97 S.Ct. 1211, 1214, 1217–18, 51 L.Ed.2d 376 (1977).[9]

---

*munity Org. v. Howell*, 652 F.2d 1227, 1245–46 (5th Cir. 1981), in which this court reviewed the Supreme Court's pre-*Middlesex* precedent and concluded that in each case, "with the exception of *Juidice*, ... the state sued civilly in aid of a criminal statute." *Id.* at 1246. Since the holding in *Gresham Park* was that the state proceeding at issue *was* "in aid of" a criminal statute, *id.* at 1246–47, any discussion of whether *Younger* would apply in a different context was unnecessary to the decision. Moreover, in *Middlesex*, which did not involve any criminal statute, the Supreme Court made clear that *Younger* was not limited to "proceedings [that] bear a close relationship to proceedings criminal in nature"; "[p]roceedings neces-

In its most recent formulation of the *Younger* doctrine, the Court has framed three questions that should be asked to determine whether abstention is appropriate:

> *first,* do [the state proceedings] constitute an ongoing state judicial proceeding; *second,* do the proceedings implicate important state interests; and *third,* is there an adequate opportunity in the state proceedings to raise constitutional challenges.

*Middlesex,* 102 S.Ct. at 2522.

*First.* Certainly the state court enforcement action is an "ongoing judicial proceeding." Plaintiffs argue that *Younger* abstention is not warranted by the state enforcement proceeding because the state did not actively pursue an injunction in that action while the Center's application for a certificate of need was pending before the Commission or while the motion to dismiss was pending in the court below. We do not think, however, that the dormancy of the enforcement proceeding reflects any bad faith on the part of the state. To the contrary, the decision to await the Commission's action on the certificate of need application reflects a sound exercise of prosecutorial discretion not to close down a facility that might later be found entitled to operate. In its final decision denying a certificate of need to the Center, issued before the plaintiffs filed their complaint in federal court, the Commission expressly requested the state attorney general to resume prosecution of the enforcement proceeding. We cannot fault the attorney general for hesitating to actively litigate the enforcement action while the Center was seeking a federal court injunction to restrain that action. The state is now attempting to enforce its law against the Center in the state action, and the plaintiffs want a federal court to enjoin that action.

*Second.* We also conclude that the state enforcement proceeding "implicate[s] important state interests." "[T]he principles of *Younger* . . . are broad enough to apply to interference by a federal court with an ongoing civil enforcement action such as this, brought by the State in its sovereign capacity." *Trainor v. Hernandez,* 431 U.S. at 444, 97 S.Ct. at 1918. The purpose of the State Act is "to insure that health-care services and facilities are made available to all citizens in an orderly and economical manner." Tex.Rev.Civ.Stat.Ann. art. 4418h, § 1.02 (Vernon Supp.1982). To achieve this purpose, the state has set up a statutory program of comprehensive planning for the expansion of health-care services. We do not think that the state's interest in administration and enforcement of this health-care program is less important than the state's interest in "maintaining and assuring the professional conduct of the attorneys it licenses," *Middlesex,* 102 S.Ct. at 2522–23, or in "safeguarding the fiscal integrity of" its public-assistance programs, *Trainor v. Hernandez,* 431 U.S. at 444, 97 S.Ct. at 1918. In this case, the Commission found that the Center had opened without attempting to comply with the State Act and that the Center has operated in violation of that Act since October 1978. It accordingly requested the state attorney general to seek an injunction. The state's efforts to procure compliance with the requirements of the State Act would be severely impaired were we now to hold that a federal court may enjoin the state enforcement proceeding rather than require those charged with violations to raise their constitutional claims in the state forum.

 Plaintiffs argue that the state does not have an "important" interest in enforcing the State Act because that law was passed to implement the Federal Act.[10]

sary for the vindication of important state policies ... also evidence the state's substantial interest in the litigation." 102 S.Ct. at 2521; *see also id.* at 2522 n.12 ("whether the proceeding 'is labeled civil, quasi-criminal, or criminal in nature,' the salient fact is whether federal court interference would unduly interfere with the legitimate activities of the state") (quoting *Juidice v. Vail,* 430 U.S. at 335–36, 97 S.Ct. at 1217).

10. If a state wishes to continue receiving grants under the many programs incorporated in the Public Health Service Act, 42 U.S.C.A. §§ 201

We think, however, that the relationship between the State Act and the Federal Act supports abstention. The Federal Act establishes the national health planning program as a joint federal-state effort. The state's interest in ensuring economical health care for its citizens is no less important than the federal government's interest.[11] In recognition of the state's interest, the Federal Act gives the state government a central role in the administration of the health-care planning program within the state.[12] In particular, the Federal Act "recognize[s] State certificate-of-need programs to be the basic component in an overall effort to control the unnecessary capital expenditures which contribute so greatly to the total national health bill." Health Planning and Resources Development Amendments of 1979, S.Rep.No.96, 96th Cong., 1st Sess. 5, reprinted in [1979] U.S. Code Cong. & Ad.News 1306, 1310. The state alone is charged with enforcement of the certificate of need program.[13] To hold that the states do not have an important interest in carrying out their enforcement function would be to denigrate their role in the national program and discourage their efforts to ensure compliance. Such a holding hardly comports with the notion of a healthy, cooperative federalism on which both the Federal Act[14] and the *Younger*

---

to 300z–10 (West 1974 & Supp.1982), then it must comply with the requirements of the National Health Planning Act. *See* 42 U.S.C.A. § 300m(d)(2) (West Supp.1982).

11. Plaintiffs make the curious argument that the provision of health care to citizens is an "exclusively" federal interest. Public health regulation has long been regarded as one of the states' primary and most important "police powers." *See, e.g., Willson v. The Black Bird Creek Marsh Co.,* 27 U.S. (2 Pet.) 245, 251, 7 L.Ed. 412, 414 (1829); *Huron Portland Cement Co. v. City of Detroit,* 362 U.S. 440, 442, 80 S.Ct. 813, 815, 4 L.Ed.2d 852 (1960); *Sporhase v. Nebraska ex rel. Douglas,* — U.S. ——, 102 S.Ct. 3456, 3464, 73 L.Ed.2d 1254 (1982) ("a State's power to regulate . . . for the purpose of protecting the health of its citizens . . . is at the core of its police power.").

12. The scheme of the Federal Act is to divide the nation into "health service areas." The primary responsibility for designating these areas rests with the governor of each state. 42 U.S.C.A. § 300*l*(b) (West Supp.1982). The "State planning and development agencies," such as the Commission, are responsible for "conduct[ing] the health planning activities of the State" and "determin[ing] the statewide health needs of the State." *Id.* § 300m–2(a)(1)(A), (B). These functions are to be carried out in conjunction with the federally-sponsored "health services agencies" ("HSAs"), each of which is to develop a "health systems plan" for its "health service area," *id.* § 300*l*–2(b)(2)(D), and the governor-appointed "Statewide Health Coordinating Council" ("SHCC"), which is to develop a "state health plan," *id.* § 300m–3(c)(2)(B). While the Federal Act assigns most of the "planning" role to the HSAs and the SHCC, the state governor may overrule any decision of an HSA regarding the use of federal funds, *see id.* § 300*l*–2(e)(3), and may disapprove the "state health plan" developed by the SHCC, *id.* § 300m–3(c)(2)(C). Most importantly, *see* text *infra,* the decision whether to grant a certificate of need is committed to the state agency. *Id.* § 300m–6(a)(5)(B)(i). *See generally National Gerimedical Hosp. & Gerontology Center v. Blue Cross,* 452 U.S. 378, 383–385, 101 S.Ct. 2415, 2419–20, 69 L.Ed.2d 89 (1981) (explaining the "crucial functions" performed by the states). In addition, the Federal Act provides for judicial review of certificate of need decisions in the state, not federal, courts. 42 U.S.C.A. § 300n–1(b)(12)(E).

13. "A certificate of need program shall provide for procedures and penalties to enforce the requirements of the program." 42 U.S.C.A. § 300m–2(a)(4)(B) (West Supp.1982). "The State certificate of need program must provide sanctions, such as the denial or revocation of a license to operate, civil or criminal penalties, or injunctive relief . . . ." 42 C.F.R. § 123.408(b) (1981).

14. The theory underlying the constitutionality of the Federal Act's "requirement" that the states pass and enforce legislation is that the states have chosen to accept this duty as a condition for receiving federal grants. *North Carolina ex rel. Morrow v. Califano,* 445 F.Supp. 532 (E.D.N.C.1977) (three-judge court) (citing *Steward Mach. Co. v. Davis,* 301 U.S. 548, 587, 57 S.Ct. 883, 891, 81 L.Ed. 1279 (1938) (Cardozo, J.) (upholding Social Security Act) ("Supporters of the statute say that its operation is not constraint, but the creation of a larger freedom, the states and the nation joining in a co-operative endeavor to avert a common evil.")), *aff'd mem.,* 435 U.S. 962, 98 S.Ct. 1597, 55 L.Ed.2d 54 (1978). *Cf. Federal Energy Regulatory Comm'n v. Mississippi,* — U.S. ——, 102 S.Ct. 2126, 2138, 72 L.Ed.2d 532 (1982) ("this Court never has sanctioned explicitly a federal command to the states to

doctrine [15] are based.

■ *Third.* The Center does not contest that it will be given full opportunity to raise its constitutional challenges in the state proceeding. The state district courts of Texas are courts of general original jurisdiction, entertaining every kind of legal and equitable claim. *See* Tex.Rev.Civ.Stat. Ann. arts. 1906, 1909 (Vernon 1964). The Texas Rules of Civil Procedure provide that "[t]he defendant to an injunction proceeding may answer as in other civil actions," Rule 690, and that "[t]he defendant in his answer may plead as many several matters, whether of law or fact, as he may think necessary for his defense," Rule 84. As in *Moore v. Sims,* 442 U.S. at 430, 99 S.Ct. at 2381, "Texas law appears to raise no procedural barriers" to the Center's assertion of its constitutional challenges.

The other plaintiffs, however, argue that abstention is inappropriate as to their claims, because they are not parties to the state court action. They place primary reliance on *Doran v. Salem Inn, Inc.,* 422 U.S. 922, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975).

*Doran* involved three corporations, each of which operated a bar in a town with an ordinance prohibiting topless dancing. The three brought an action in federal court challenging the ordinance, but one of them repeatedly violated the ordinance and criminal proceedings were brought against it. The Court held that *Younger* barred relief to the corporation that was being prosecuted, but not to the other two corporations. 422 U.S. at 928–29, 95 S.Ct. at 2566. The Court noted, however, that "there plainly may be some circumstances in which legally distinct parties are so closely related that they should all be subject to the *Younger* considerations that govern any one of them." *Id.* at 928, 95 S.Ct. at 2566.

An example of such "closely related" parties is provided by *Hicks v. Miranda,* 422 U.S. 332, 95 S.Ct. 2281, 45 L.Ed.2d 223 (1975) (alternative holding). In *Hicks,* the state seized allegedly obscene films at a theater and filed criminal charges against two of the theater's employees. The owners of the theater brought a federal action for declaratory and injunctive relief against the state obscenity statute. The Supreme Court held that the district court should have abstained from entertaining the owners' constitutional challenges. The Court pointed out that the two employees, as well as the films belonging to the owners, were before the state criminal court. The Court then explained:

> Obviously, [the owners'] interests and those of their employees were intertwined; and ... the federal action sought to interfere with the pending state prosecution. *Absent a clear showing* that [the owners], whose lawyers also represented their employees, could not *seek the return of their property in the* state proceedings and *see to it that* their federal claims were presented there, the requirements of *Younger v. Harris* could not be avoided on the ground that no criminal prosecution was pending against [them] . . . .

422 U.S. at 349–50, 95 S.Ct. at 2291–92 (emphasis added).[16]

■ We conclude that the interests of the parties in this case are so completely

---

**15.** ["Our Federalism" involves] a proper respect for state functions, ... and ... the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways. . . . The concept does not mean blind deference to "States' Rights" promulgate and enforce laws and regulations"); *National League of Cities v. Usery,* 426 U.S. 833, 851, 96 S.Ct. 2465, 2474, 49 L.Ed.2d 245 (1976) (Congress may not "directly displace the States' freedom to structure integral operations in areas of traditional governmental functions").

. . . . What the concept does represent is a system in which there is sensitivity to the legitimate interests of both State and National Governments . . . . *Younger,* 401 U.S. at 44, 91 S.Ct. at 750.

**16.** The Court went on to hold, alternatively, that the institution of state criminal proceedings against the owners *after* they filed their federal complaint, "but before any proceedings of substance on the merits ha[d] taken place in the federal court," also resulted in a *Younger* bar. 422 U.S. at 349, 95 S.Ct. at 2292.

intertwined that the same *Younger* bar must apply to all. We recognize that the general rights of the plaintiff women and doctors in making the abortion decision are legally distinct from any rights the Center may assert; indeed, whatever constitutional claims the Center may have under *Roe v. Wade* must derive from the rights of women. *See* 410 U.S. at 153, 93 S.Ct. at 727 ("Th[e] right to privacy . . . is broad enough to encompass a *woman's decision* whether or not to terminate her pregnancy.") (emphasis added). But the present case involves only a single question: whether the Center can continue to operate consistently with the certificate of need requirements. The plaintiff women do not allege that the state might interfere with their ability to obtain an abortion anywhere but at the Center; the plaintiff doctors do not allege that the state might interfere with their ability to perform abortions anywhere but at the Center. The only relief requested is an order for the continued operation of the Center. *Cf. Doran*, 422 U.S. at 928–29, 95 S.Ct. at 2566 (each plaintiff claimed injury to operation of its own establishment). All plaintiffs are represented by the same law firm, and are clearly able to see to it that the constitutional challenge is raised in the state court.

■ *Younger* cannot be avoided simply by joining nonparties to the state court proceeding in order to procure injunctive and declaratory relief against that proceeding. Because this action would interfere with pending judicial proceedings in which the state has an important interest and in which there will be full opportunity to raise the constitutional challenges, we hold that the action was properly dismissed.

### C. *Conclusion*

Our emphasis on the state's strong interest in enforcing its laws should not be read in any way as an intimation of our views on the merits of this particular lawsuit. We trust that, consistent with the concept of federalism on which the *Younger* doctrine is based, the state court will give careful attention to the Center's serious allegations of federal constitutional and statutory violations.

AFFIRMED.