Carol GOLDMAN, individually and as a trustee of the Donald J. Goldman, P.C. Defined Benefit Pension Plan, Plaintiff,

v.

The ESTATE OF Byrdie GOLDMAN, deceased, Defendant.

No. 97 Civ. 2455(RMB).

United States District Court,
S.D. New York.

March 29, 2000.

Barry A. Kozyra, Walder, Sonsak, Berkeley & Brogan, P.A., Roseland, NJ, for Carol Goldman.

## ORDER

BERMAN, District Judge.

At the heart of this dispute is a bitter intra-family feud over the estate of Byrdie Goldman who died in 1991. The feud has given rise to multiple lawsuits in different forums. At one point, it led to the issuance of an arrest warrant for Byrdie Goldman's son Donald Goldman, a New York attorney. Mr. Goldman has been accused of violating New Jersey State court orders; of improperly (fraudulently) transferring funds out of the estate of his mother; and even of placing his sister in a nursing home without telling her other relatives (and telling her only that he was taking her out to buy an ice cream cone).

On or about April 14, 1999, Carol Goldman ("Plaintiff" or "Mrs. Goldman"), who is Donald Goldman's wife, submitted an application to this Court for Judgment by Default against The Estate of Byrdie Goldman ("Defendant" or "Estate") on the basis of the Estate's alleged failure to answer Plaintiff's Amended Complaint in this action. At the time the default application was submitted, this action had been pending (and aggressively litigated) for nearly two years.[1] On May 17, 1999, the Estate cross moved for an order denying Mrs. Goldman's application for a default and dismissing Mrs. Goldman's Amended Complaint (for lack of jurisdiction) pursuant to Federal Rule of Civil Procedure ("Fed.

R.Civ.P.") 12(b),[2] or, alternatively, granting summary judgment to Defendant pursuant to Fed.R.Civ.P. 56. In accordance with this Court's Order, dated July 28, 1999, the parties have also submitted briefs addressing the issue of "whether the doctrine of abstention is applicable here." **For the reasons set forth below, Plaintiff's application for a default judgment is denied; and the Defendant's motion for dismissal or summary judgment is denied. The Court has determined to abstain from further adjudication of this action pending the conclusion of *In the Matter of the Estate of Byrdie Goldman* in the Probate Part of the Chancery Division of the New Jersey Superior Court in Passaic County.**

## I. *Background*

On March 20, 1991, Byrdie Goldman executed a will leaving half of her estate to her son, Donald Goldman, and placing the other half in trust for the care of her mentally disabled daughter Carolyn Goldman.[3] *See Goldman v. Walder, Sondak & Brogan, P.A.* [hereinafter "*Goldman*"], No. 97 Civ. 2455, 1998 WL 5391, at *1 (S.D.N.Y. Jan. 7, 1998). On October 27, 1991, Byrdie Goldman died, precipitating a tortuous, strife ridden intra-familial dispute that has spawned at least five separate legal actions, including this one, in at least four different federal and state courts. On one side stands the late Byrdie Goldman's Estate and her nephew, Justin Walder ("Walder"), the executor of the Estate and the guardian of Carolyn Goldman. On the other side stands Byrdie Goldman's son Donald Goldman and his wife Carol Goldman. At center stage is

---

1. Mrs. Goldman filed the instant action on April 8, 1997, seeking to prevent the implementation of certain orders and directives of the New Jersey Superior Court in Passaic County against Mr. Goldman and others which involved accounts at Merrill Lynch in New York (**including, but not limited to, the Donald J. Goldman, P.C. Defined Benefit Pension Plan (hereinafter the "Plan" or "ERISA account")**).

2. On December 17, 1999, the Estate submitted a letter to the Court stating "we do hereby withdraw our Motion to Dismiss for Lack of Diversity Jurisdiction."

3. Carolyn Goldman is the legally incompetent sister of Donald Goldman.

the Probate Part of the Chancery Division of the New Jersey Superior Court in Passaic County, New Jersey, to which the matters of the will and the Estate of Byrdie Goldman were transferred (from the New Jersey Surrogate's Court) on or about June 2, 1993—upon Walder's claim that Donald Goldman wrongfully appropriated assets belonging to his mother shortly before her death. *In the Matter of the Estate of Byrdie Goldman* [hereinafter "*In Re: Byrdie Goldman*"], No. 159574 (N.J.Super.Ct.Ch.Div. Probate Pt.) [4]

On June 21, 1994, New Jersey Superior Court Judge Amos C. Saunders—after finding that Mr. Goldman had falsely denied withdrawal of assets from his mother's bank accounts shortly before her death—concluded "that the Estate of Byrdie Goldman is entitled to the relief sought, including the issuance of a Writ of Attachment" and ordered Mr. Goldman "and his agents, servants, and employees" to transfer $382,504.20 into Walder's custody, pending resolution of competing claims to Byrdie Goldman's estate funds. *See In Re: Byrdie Goldman* (June 21, 1994). **Mr. Goldman failed to comply with Judge Saunders' order "consistently and continually violat[ing] the orders of th[e] court."** *See* Tr. of Mot., Sept. 16, 1994, at 8, *In Re: Byrdie Goldman.* [5]

**On September 29, 1994, Judge Saunders entered a judgment against Mr. Goldman in the amount of $382,504.20.** *See In Re: Byrdie Goldman* (Sept. 29, 1994). Judge Saunders further ordered "that Donald Goldman, individually, and through the law practice of Donald Goldman, Esq., an attorney at law of the State of New York, his agents, servants, and/or employees and/or anyone acting in concert with him are restrained" from transferring property in which any of these persons have a beneficial, legal or possessory interest. *See id.* There is no evidence in the record that Mr. Goldman ever attempted to satisfy the judgment. [6]

---

4. The Probate Part has also assumed jurisdiction with regard to other issues arising from the death of Byrdie Goldman. For example, as to the guardianship of Carolyn Goldman (who had lived with her mother prior to October 27, 1991), the Court determined that appointment of Carolyn's cousin, Justin Walder, instead of her brother, Donald Goldman, would best serve Carolyn Goldman's interests.

[T]he sole reason that Mr. Goldman placed his sister in a nursing home in August of 1992 was in effect to ... get her out of the way and at least inconvenience and expense to him without considering the best interest or needs of his sister. He placed her in a nursing home that he had not even inspected. He put her in a nursing home that was basically filled with old people that were extremely sick and many in a comatose condition. In fact, his sister's roommate was comatose. There was no social life to be provided for Carolyn [or] any recreation.
...
The Court is extremely distressed that he placed her into this nursing home without telling her relatives, that he lied to his sister and told her he was taking her out for ice cream and dropped her off at a nursing home....
... [Carolyn] was hysterical while in the nursing home....
Mr. Goldman ... gave a phone number where he said that he could be reached but in fact it was a phone number where he could not be reached.
...
The Court also has some concerns ... over the question of whether Mr. Goldman is qualified or able to properly maintain the appropriate accounts for his sister during the period of guardianship.
I've looked at the record he put in evidence concerning his handling of his sister's $3500. I don't understand it. The accounts are horrible. There's some handwriting scratched on a piece of paper. Most of those expenses are not expenses of his sister and should not be charged to his sister.
Excerpt Tr. of Proceedings (Decision), *In the Matter of Carolyn Goldman*, No. 157598 (N.J.Super.Ct.Ch.Div. Probate Pt. Feb. 1, 1993) (emphasis added).

5. At one point, Judge Saunders issued a warrant for Mr. Goldman's arrest and directed Walder to advise the Ethics Committee of the Bar of the State of New York about the conduct of Mr. Goldman, a New York attorney. *In Re: Byrdie Goldman* (July 25, 1994).

6. On March 29, 1995, Judge Saunders' order of September 29, 1994 was converted into a New York judgment; and Justice Joan B. Lobis of the New York Supreme Court or-

On February 3, 1997, Judge Saunders ruled "that Donald Goldman engaged in fraudulent conduct with respect to the assets of Byrdie Goldman, both prior to and subsequent to her death." *See In Re: Byrdie Goldman* (Feb. 3, 1997). Having heard "evidence that the Plan [i.e. the Donald J. Goldman, P.C. Defined Benefit Pension Plan] was being used to hide some of Mr. Goldman's assets, [and/or the assets of his law practice,] from the Estate, in violation of the restraining order of September 29, 1994," *see Goldman* at *6 (Jan. 7, 1998), Judge Saunders issued a Writ of Execution against the Plan account, among other accounts held by Mr. and/or Mrs. Goldman at Merrill Lynch. *See In Re: Byrdie Goldman* (Mar. 20, 1997).

As noted, on April 8, 1997, Carol Goldman, individually and as a trustee of the Plan, filed an action in this Court for declaratory and injunctive relief seeking to prevent the Estate from executing on the New Jersey Superior Court Judgment against Merrill Lynch accounts and for damages. (Am.Compl. at 5–6.) With respect to the Plan account, in particular, Mrs. Goldman claimed that certain provisions of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq.*, precluded execution of the New Jersey judgment. *See id.* ¶ 20. On April 21, 1997, U.S. District Court Judge Robert P. Patterson (initially) stayed the execution of the New Jersey judgment against the Plan account, but did so upon Mrs. Goldman's assurance(s) that she would present her claim(s) before the New Jersey Court. *See Goldman* (Apr. 21, 1997). Specifically, Judge Patterson directed Mrs. Goldman to reapply for Federal relief if, "after an appearance by Mr. & Mrs. Goldman in the New Jersey Court on May 9, 1997, that Court does not order an evidentiary hearing with respect to the source of the funds in the Plan but instead orders the assets of the Plan transferred sua sponte." *See Goldman* (May 8, 1997). **Neither Mrs. Goldman nor Mr. Goldman ever appeared before the New Jersey Court as directed by Judge Patterson.** *See Goldman* at *3 (Jan. 7, 1998).

On May 9, 1997 (in the Goldmans' absence), Judge Saunders made the following factual findings with respect to the Plan account:

> In April, 1991, Donald Goldman, a New York Lawyer and sole practitioner, had an individual retirement account at Merrill Lynch titled "The Donald J. Goldman IRA, FBO [for the benefit of] Donald J. Goldman...." As of October 2, 1995 this account had a balance of $24,279.84. This account has not been frozen at Merrill Lynch. At the same time, Donald Goldman also had a second account with Merrill Lynch, designated,

dered Mr. Goldman to pay $382,504.02, plus interest and costs, to Walder. *See Estate of Goldman v. Goldman,* No. 130791/94 (N.Y.Sup.Ct. Mar. 29 & May 19, 1995), *aff'd* 224 A.D.2d 253, 253, 638 N.Y.S.2d 6 (N.Y.A.D., 1st Dep't 1996) ("Given the extensive record developed in the New Jersey proceeding showing deception and evasiveness on defendant's part, and that defendant had ample opportunity to advance his claims or defenses in that proceeding, enforcement of the New Jersey judgment was a proper exercise of discretion.").

In response to Walder's subsequent efforts to attach Mr. Goldman's accounts, Mr. Goldman filed an action in the U.S. District Court for the Eastern District of New York, claiming that attachment of his funds constituted "abuse of process" and that Walder had "defamed" Mr. Goldman's character. *See Gold-* *man v. Walder,* 1996 WL 1088909 (E.D.N.Y. May 29, 1996). **Mr. Goldman's Federal complaint was dismissed for failure to state a claim on May 29, 1996.** *Id.*

On February 16, 1996, the Estate commenced an action in New York Supreme Court, naming both Carol and Donald Goldman as defendants and alleging that a transfer of funds out of the account of Donald Goldman and into the name of Carol Goldman (in order to prevent satisfaction of the March 29, 1995 New York Supreme Court judgment against Mr. Goldman) constituted a "fraudulent conveyance" as defined in New York Debtor and Creditor Law §§ 273, 274 & 276. *See* Compl., *Estate of Byrdie Goldman v. Carol Goldman,* No. 103008/1996 (N.Y.Sup. Ct.). The case was tried before Justice Barbara Kapnick, without a jury, and the parties currently await decision.

"The Donald J. Goldman P.C. Defined Benefit Pension Plan".... As of January 1, 1991 this account had a portfolio value of $77,508.14.

Coinciding with Byrdie Goldman's declining health, Donald Goldman opened a new "retirement account" at Merrill Lynch, "Donald J. Goldman Basic Retirement".... Ignoring the IRA account and focusing simply on the Defined Benefit Pension Plan Account ... and the new Basic Retirement Account ..., **Donald Goldman deposited almost $2,000,000 in cash into the two Merrill Lynch accounts in a period of slightly less than five years.** Byrdie Goldman had mentioned to Justin Walder [now Executor of her Estate] a safe deposit box in lower New York with bearer bonds in it; Donald Goldman said there was such a safe deposit box, but that he did not know where it was in New York. Many of the deposits after April 1991 were from cashier's checks—similar to those issued when bearer bonds are cashed.... **To date, we have been unable to learn from Donald Goldman through discovery (or from anyone else) the source of these substantial uncharacteristic deposits.**

Donald Goldman also accumulated money in his Merrill Lynch Basic Retirement Account.... On July 5, 1995, he withdrew the balance from this account of $156,079.11.... **This wrongful withdrawal was made notwithstanding this Court's Restraining Order of September 16, 1994, and a similar Order entered in New York on March 29, 1995 by The Honorable Joan Lobis.** On July 6, 1995, Defendant Donald Goldman endorsed the check for $156,079.41 to his wife Carol Goldman and one of his sons, Michael Goldman, who deposited it to their joint account at Merrill Lynch.

Tr. of Mot., May 9, 1997, at 9, *In Re: Byrdie Goldman* (incorporating by reference Certification of Barry A. Kozyra, Apr. 23, 1997) (emphasis added). "The infer-

ence, clearly, from the conduct of everyone in this case, is that [the] $2,000,000 represents [Byrdie Goldman's bearer] bonds ...."

**There's no way that Mr. Goldman or anyone can legitimately and properly argue that this De[f]ine[d] Benefit Pension Plan is protected by ERISA or anything else. Certainly the moneys can be traced. And if they are ill-gotten monies, they are not protected. And certainly, the litigants in this case have a right to trace those assets and to remove them from that account.**

*Id.* at 7–8. On May 13, 1997, Judge Saunders issued an Order and Judgment granting the Estate's Motion for Sale of Assets and Turnover of Funds, with respect to the Plan account, among others. *See In Re: Byrdie Goldman* (May 13, 1997).

On January 7, 1998, Judge Patterson, in ruling upon cross motions of the parties herein, stated the following:

ERISA's anti-alienation provision is not absolute.

...

... [I]f it can be shown that funds were improperly contributed to the Plan account, neither Mr. Goldman as the Plan's beneficiary, nor Mrs. Goldman, as its Trustee, can object to these funds being returned to Byrdie Goldman's estate. Funds placed by the beneficiary illegally into a Plan account cannot be said to have "vested."

... If it can be shown that the Plan has been used by its beneficiary and Trustee, to hide stolen assets, neither the beneficiary nor his dependents can be said to have any legitimate expectations as to the disbursement of these funds.

*Goldman,* 1998 WL at *7–9 (Jan. 7, 1998).[7]

## II. *Application for Default Judgment*

■ As noted, in April of 1999, Mrs. Goldman sought entry of a default judg-

7. Judge Patterson also noted that "discretion-

ary authority may exist to defer to the state

ment against the Estate, asserting that "[t]he defendant, Estate of Byrdie Goldman has not answered the complaint and the time for defendant to answer the complaint has expired." (Mossberg Aff., Apr. 14, 1999, at ¶ 8.) The Estate argues that Mrs. Goldman's application should be denied because, among other reasons: (i) Plaintiff's counsel was well aware of the fact that the Estate filed an answer to the complaint on April 12, 1999 before he filed his default application; (ii) the Defendant had vigorously and consistently defended the action through numerous motions, discovery proceedings and court appearances since the filing of the Amended Complaint; and (iii) Plaintiff did not make reference to prejudice or even inconvenience.

As the Affidavit of Barry A. Kozyra (attorney for Justin Walder) amply sets forth, the Estate has consistently defended this action between the time it was commenced and time of Mrs. Goldman's application for judgment by default. (Kozyra Aff., May 17, 1999, ¶¶ 4–7.) When the Estate realized its omission to file an amended answer, it promptly did so on April 12, 1999. In fact, at the time of Plaintiff's application (dated April 14, 1999), the parties were preparing for trial. There is no evidence that Plaintiff has suffered any prejudice whatsoever.

"Defaults are not favored, particularly when the case presents issues of fact, and doubts are to be resolved in favor of a trial on the merits." *Meehan v. Snow,* 652 F.2d 274, 277 (2d Cir.1981). "[W]here, as here, a defendant opposes a plaintiff's motion for a default judgment ..., the district court should consider three factors: 1) whether, and to what extent, the default was willful; 2) whether defendants have a meritorious defense; and 3) whether [denying a default judgment] would cause prejudice to the plaintiff." *Credit Lyonnais Securities (USA) v. Alcantara,* 183 F.3d 151, 154 (2d Cir.1999). **None of these factors supports a default here.**

court actions ..." *Goldman* at *9 n. 8

## III. *Abstention*

In *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), a federal court plaintiff sought to enjoin a state district attorney from continuing criminally to prosecute him under a state statute which he claimed was unconstitutional. *See Younger* at 39, 91 S.Ct. 746. The Supreme Court held that federal intervention would be improper and, in so doing, cited principles of equity and comity:

> Since the beginning of this country's history Congress has, subject to few exceptions, manifested a desire to permit state courts to try state cases free from interference by federal courts....
>
> ... [T]he primary sources of the policy are plain. One is the basic doctrine of equity jurisprudence that courts of equity should not act ... when the moving party has an adequate remedy at law and will not suffer irreparable injury if denied equitable relief.... [A]n even more vital consideration [is] the notion of 'comity,' that is, a proper respect for state functions, a recognition of the facts that the entire country is made up of a Union of Separate state governments, and a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways. This ... is referred to by many as 'Our Federalism'....

*Younger* at 43–44, 91 S.Ct. 746.

 Abstention, in accordance with *Younger* principles, is appropriate where as here: "(i) the state proceedings are ongoing; (ii) the proceedings implicate important state interests; and (iii) the state proceedings provide an adequate opportunity to raise federal questions." *Delta Dental Plan v. Mendoza,* 139 F.3d 1289, 1294 (9th Cir.1998); *see Middlesex County Ethics Committee v. Garden State Bar Association,* 457 U.S. 423, 432, 102 S.Ct.

2515, 73 L.Ed.2d 116 (1982); *Younger* at 49, 91 S.Ct. 746 (emphasizing that "a proceeding was already pending in the state court, affording Harris an opportunity to raise his constitutional claims."). These abstention criteria are met here.[8]

As the Estate points out, "this federal action was filed after execution on the Estate's New Jersey judgment." (Estate Letter Mem., Aug. 19, 1999, at 4.) Secondly, as the Estate contends, states have an important interest "in ensuring that their state court orders, judgments and executions are enforced to protect their citizens rights." (*Id.*) Thirdly, Mrs. Goldman's (purported) ERISA claim "could have been raised by the Goldmans" in the state proceedings. (*Id.*)

Mrs. Goldman argues, unpersuasively, that because "the instant case involves no state action whatsoever [it] does not satisfy the first element of Younger abstention," (Goldman Letter Mem., Aug. 20, 1999, at 5); it does not concern "central sovereign functions of state government," (*id.* at 5–7); and "the plaintiff in the instant case is not presented with *any* opportunity, no less an adequate one, to resolve its ERISA claims," (*id.* at 7).

### A. *Ongoing State Proceedings*

Mrs. Goldman's contention that "*Younger* abstention reaches only those cases where the state is a party" is incorrect. In *Juidice v. Vail,* 430 U.S. 327, 97 S.Ct. 1211, 51 L.Ed.2d 376 (1977), the Supreme Court applied the abstention doctrine of *Younger* to a civil action among private parties. Nor can it seriously be disputed that proceedings involving the same underlying events presented here were ongoing in New Jersey (and New York) at the time Plaintiff commenced the instant action.

### B. *Important State Interests*

Mrs. Goldman's contention that New Jersey (and New York State) interests

implicated in the litigation at bar are not "important state interests" is likewise without merit. In *Juidice,* the federal plaintiff failed to pay a state money judgment and failed to appear in state court as had been ordered. *See id.* at 328–29, 97 S.Ct. 1211. Instead, he sought injunctive relief in U.S. District Court, claiming that state contempt procedures against him violated his constitutional rights. *See id.* at 330, 97 S.Ct. 1211. The Supreme Court, in upholding abstention, reasoned that "[a] State's interest in the contempt process, through which it vindicates the regular operation of its judicial system, so long as that system itself affords the opportunity to pursue federal claims within it, is surely an important interest." *Id.* at 335, 97 S.Ct. 1211.

Similarly, in *Pennzoil v. Texaco,* 481 U.S. 1, 107 S.Ct. 1519, 95 L.Ed.2d 1 (1987), the (federal) defendant had obtained a state court judgment against the (federal) plaintiff, on the basis of which state law permitted the defendant to secure a writ of execution. *See id.* at 4–5, 107 S.Ct. 1519. The (federal) plaintiff, although he had presented no federal defenses during the state trial, thereafter sought in federal court to enjoin his adversary from enforcing the state judgment, asserting various federal constitutional and statutory rights. *See id.* at 6, 107 S.Ct. 1519. The Supreme Court (reaffirmed and) applied the principles set out in *Juidice:*

> That case rests on the importance to the States of enforcing the orders and judgments of their courts. There is little difference between the State's interest in forcing persons to transfer property in response to a court's judgment and forcing persons to respond to the court's process on pain of contempt. Both Juidice and this case involve challenges to the processes by which the State compels compliance with the judgments of its courts. Not only would federal injunctions in such cases interfere with the

---

**8.** The abstention analysis refers principally to the New Jersey State court proceedings. It also appears applicable to the New York State

court proceedings, which are an outgrowth of the Estate's attempts to enforce the judgment(s) of the New Jersey court.

execution of state judgments, but they would do so on grounds that challenge the very process by which those judgments were obtained. So long as those challenges relate to pending state proceedings, proper respect for the ability of state courts to resolve federal questions presented in state-court litigation mandates that the federal court stay its hand.

*Pennzoil* at 13–14, 107 S.Ct. 1519. Here, New Jersey's (and New York's) interest in enforcing its orders and judgments, specifically "in forcing persons to transfer property in response to a court's judgment," is clearly at stake and the Court concludes that "important state interests" are implicated.

### C. *Adequate Opportunity to Raise Federal Question*

In light, among other things, of Judge Saunders' findings and rulings, Judge Patterson's directives, and the New York State court proceedings, it is doubtful that Mrs. Goldman's ERISA defenses "are not presently before any other Court in any action where the pension plan is a party." (Goldman Letter Mem., Aug. 20, 1999, at 7). There is no suggestion that the New Jersey proceedings (and Judge Patterson) did not afford her an adequate opportunity to litigate her federal claims. Quite the opposite is true. "[T]he burden on this point rests on the federal plaintiff to show 'that state procedural law barred presentation of [her] claims.'" *Pennzoil* at 14, 107 S.Ct. 1519 (quoting *Moore v. Sims,* 442 U.S. 415, 432, 99 S.Ct. 2371, 60 L.Ed.2d 994 (1979)). Furthermore, "when a litigant has not attempted to present [her] federal claims in related state-court proceedings, a federal court should assume

that state procedures will afford an adequate remedy, in the absence of unambiguous authority to the contrary." *Id.* at 15, 107 S.Ct. 1519.

In this case, the various Merrill Lynch accounts, including the Plan account, are already the subject of the New Jersey (and New York) State proceedings. Moreover, New Jersey law explicitly recognizes Mrs. Goldman's right to participate in the New Jersey proceedings.[9] (Mrs. Goldman is already a participant in the pending New York State case.) Moreover, Judge Saunders expressly stated that he would have "considered pleadings . . . submitted in opposition [to the Estate's Motion for Sale of Assets] on behalf of Defendant Donald Goldman and interested party Carol Goldman." *In Re: Byrdie Goldman* (May 13, 1997).

Here it is abundantly clear that appellees had an opportunity to present their federal claims in the state proceedings. No more is required to invoke Younger abstention. There is no support . . . for the District Court's belief that state courts must have an actual hearing (to which a recalcitrant defendant would presumably be brought by force) in order for Younger . . . to apply. Appellees need to be accorded only an opportunity to fairly pursue their constitutional claims in the ongoing state proceedings, and their failure to avail themselves of such opportunities does not mean that the state procedures were inadequate. Presumptively, therefore, the principles which underlie Younger call for dismissal of the action.

*Juidice* at 335–37, 97 S.Ct. 1211.

In *Hicks v. Miranda,* 422 U.S. 332, 95 S.Ct. 2281, 45 L.Ed.2d 223 (1975), the Su-

---

9. R. 4:33–1 provides for intervention as of right in pending litigation

. . . if the applicant claims an interest relating to the property or transaction which is the subject of the action and he is so situated that the disposition of the action may as a practical matter impair or impede his ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

There is no question that this rule is equally applicable to a probate action, R. 4:84–1(c) provides that "persons in interest may, on motion, intervene" in a disputed probate matter.

*In the Matter of the Probate of Alleged Will of David D. Gardner,* 215 N.J.Super. 578, 522 A.2d 492, 495 (1987).

preme Court held that the principles of comity recognized in *Younger* may require abstention even where the federal plaintiff is not a party, or in strict privity with a party, to the state proceedings. In that case, a theater owner sought an injunction against enforcement of a state obscenity statute and the return of four seized films, at a time when two of his employees (but not the theater owner himself) had been charged in a state criminal action. *See id.* at 334–37, 95 S.Ct. 2281. The Supreme Court ruled:

> The District Court committed error in reaching the merits of this case.... [The owners] had a substantial stake in the state proceedings, so much so that they sought federal relief.... Obviously, their interests and those of their employees were intertwined and ... the federal action sought to interfere with the pending state prosecution. Absent a clear showing that appellees ... could not seek the return of their property in the state proceedings and see to it that their federal claims were presented there, the requirements of Younger v. Harris could not be avoided ... The rule in Younger v. Harris is designed to 'permit state courts to try state cases free from interference by federal courts,'

particularly where the party to the federal case may fully litigate his claim before the state court. Plainly, '[t]he same comity considerations apply,' where the interference is sought by some, such as appellees, not parties to the state case.

*Id.* at 348–49, 95 S.Ct. 2281 (internal citations omitted).[10]

**It is abundantly clear from the record that the interests of Mrs. and Mr. Goldman in defense of the Plan account are inextricably intertwined and are so closely related to their interests against the Estate in the New Jersey (and New York) proceedings that *Younger* principles apply.** Among other things, the record shows:

(a) Mrs. and Mr. Goldman have been the sole officers of Donald J. Goldman P.C., a New York law practice, during the relevant years both prior and subsequent to Byrdie Goldman's death. (Pl.'s Resp. to Def.'s Interrogs., Jan. 11, 1999, Schedule A.) *See Hicks v. Miranda,* 422 U.S. at 348, 95 S.Ct. 2281; *Collins,* 807 F.2d at 102 (relying upon, among other things, the federal and state parties' employment by, and/or ownership of, the same business); *Stivers,* 575 F.2d at 203 (relying upon,

---

**10.** The following week, the Supreme Court reaffirmed the principle that "there plainly may be some circumstances in which legally distinct parties are so closely related that they should all be subject to the Younger considerations which govern any one of them." *Doran v. Salem Inn,* 422 U.S. 922, 928, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975) (concluding that three businesses "unrelated in terms of ownership, control and management" were not "so closely related"); *see also Casa Marie, Inc. v. Superior Court of Puerto Rico,* 988 F.2d 252, 268 (1st Cir.1993) (holding abstention required where "nonintervenor 'co-lessees' ... took no action until after the Superior Court judgment [against their landlord] was entered, even though they had actual knowledge that a Superior Court judgment threatened the very injury they now decry"); *Collins v. County of Kendall,* 807 F.2d 95, 102 (7th Cir.1986) (concluding that the District Court abstained properly where an adult bookstore owner and two employees, one of whom was not a party to a pending state

action, "shared the same interest in contesting the state litigation the classification of the magazines as obscene, and [the plaintiffs who were parties in the state action] could adequately represent that interest in the state proceeding"); *Women's Community Health Center v. Texas Health Facilities Commission,* 685 F.2d 974 (5th Cir.1982) (holding the interests of two medical doctors and three pregnant women and the interests of the Women's Community Health Center, the sole defendant in the state action, to be "so completely intertwined that the same Younger bar must apply to all"); *Stivers v. State of Minnesota,* 575 F.2d 200, 203 (8th Cir.1978) (holding that the "district court correctly applied the principles of Younger to [Federal plaintiffs challenging state law practice regulations], even thought they were not named as parties in the state proceedings," because their interests were "closely intertwined" with those of fellow legal association members sued in state court for unauthorized practice of law).

among other things, the federal and state parties' status as officers, co-members, or employees of the same organization);

(b) Both Mrs. and Mr. Goldman have been the beneficiaries of the Plan since its establishment in 1981. (Pl.'s Resp. to Def.'s Interrogs., Jan. 11, 1999, Silberstein Statement);

(c) Mrs. Goldman manages the couple's finances, *see* Carol Goldman Dep., Jan. 22, 1996, at 10, *In Re: Byrdie Goldman,* including an account that originally contained approximately $382,000 allegedly stolen from the Estate, *see* Donald Goldman Dep., Jan. 22, 1996, at 98, *In Re: Byrdie Goldman;*

(d) Both Mrs. and Mr. Goldman have been defendants in the New York State Supreme Court fraudulent conveyance action since its inception on February 16, 1996. In 1997, Mrs. and Mr. Goldman entrusted their defense to common counsel, to wit their son, Scott Goldman, also a New York attorney. *See* Consent to Change Attorney, Mar. 7, 1997 & Apr. 28, 1997, *Estate of Byrdie Goldman v. Carol Goldman,* No. 103008/1996 (N.Y.Sup.Ct.);

(e) Mrs. Goldman has been aware of the New Jersey litigation, including judicial findings of Mr. Goldman's alleged misappropriation of the Estate's assets and deposits in the Plan account over the years following Byrdie Goldman's death. She "reviewed" the complaints and affidavits filed in the New Jersey action. *See* Carol Goldman Dep., Jan. 1996, at 15, *In Re: Byrdie Goldman.* **She received notice of the restraining orders issued in the New Jersey case.** (*Id.* at 78, 85.) She was deposed and submitted affidavits in the New Jersey action. She consulted with one of Mr. Goldman's attorneys, Kenneth Rubenstein, with whom she discussed the subject matter of the litigation. (*Id.* at 18–23.) *See Casa Marie,* 988 F.2d at 268 (relying upon, among other things, nonintervenors' "actual knowledge" of the nature of the state proceedings);

(f) The New Jersey Court's September 29, 1994 Order and Judgment was broad enough to restrain Mrs. Goldman, as one of Donald Goldman's "agents, servants and/or employees and/or anyone acting in concert with him," from transferring bank accounts in which such person (or Donald Goldman) had an interest. *See In Re: Byrdie Goldman* (Sept. 29, 1994). Despite this Order, Mrs. Goldman proceeded to transfer a bank account jointly held by herself and Mr. Goldman into her name alone. *See Goldman* at *2 (Jan. 7, 1998) (citing Carol Goldman Dep., Jan. 22, 1996, at 95–99, *In Re: Byrdie Goldman* ). *See Casa Marie,* 988 F.2d at 268 ("[T]he district court, were it to grant the nonintervenors injunctive relief, effectively would be placed in the apparent position of actively condoning Casa Marie's contumacious disregard of the Superior Court judgment.");

(g) Mrs. Goldman was directed by Judge Patterson to appear in the New Jersey action on May 9, 1997. She failed to do so. *See Goldman* (May 8, 1997 & Jan. 6, 1998);

(h) Mrs. Goldman may have acted in concert with Mr. Goldman in obfuscating rights to the disputed funds and obstructing proceedings in the New Jersey court. For example, she acknowledged that she informed the couple's accountant, Jeffrey Bernstein, that "the assets that were in the joint accounts of Donald and Byrdie Goldman, and reported on Byrdie Goldman's tax returns, were not really her [Byrdie Goldman's] assets in whole or in part." Carol Goldman Dep., Jan. 22, 1996, at 34–37, *In Re: Byrdie Goldman.* Shortly after her husband testified that on April 13, 1991 his hospitalized mother "had a premonition" and, without explanation, asked him to empty "all the [joint] accounts," Mrs. Goldman testified:

Q: Were you present during any discussions that she had with Donald Goldman concerning any joint accounts that the two of them had?

A: ... I wasn't—I might have gone down for coffee, you know.

. . .

Q: . . . [Y]ou have no particular rec-
ollection [of Donald and Byrdie discuss-
ing the joint accounts] on that particular
occasion?

A: She might have discussed it on
that particular day.

Q: What did she say?

A: That she wanted him to take the
money out.

Q: And what did she tell him to do
with the money?

A: What she told him to do with the
money?

Q: Yes.

A: Nothing. She said to take it out.
It's his money anyway.

Q: Did she say it's your money any-
way?

A: Well, she said, you know, she
wanted him to have his share, whatever
it is. It's for him anyway.

Q: My question was did she say it's
your money anyway?

A: Well, she said it will be your mon-
ey anyway. Whatever.

. . .

Q: . . . [D]o you have a specific rec-
ollection of being present when Donald
Goldman spoke to Byrdie Goldman
about joint accounts that day?

A: I don't remember.[11]

*Id.* at 51–55. *See id.* at 90–99;

(i) Mrs. Goldman has presented no com-
pelling evidence to distinguish her inter-
ests, individually or allegedly as "trustee"
of the Plan, from those of Mr. Goldman.
*See Stivers,* 575 F.2d at 203 (relying upon,
among other things, the fact that federal
plaintiffs "made no attempt to distinguish

their interests" from those of the state
parties); *see also Women's Community
Health Center,* 685 F.2d at 982.

## IV. *Colorado River Abstention*

■ In *Colorado River Water Conser-
vation Dist. v. United States,* 424 U.S. 800,
96 S.Ct. 1236, 47 L.Ed.2d 483 (1976), the
U.S. Supreme Court held that, even where
a case may not fit within other abstention
categories, abstention still may be appro-
priate for reasons of " 'wise judicial admin-
istration, giving regard to conservation of
judicial resources and comprehensive dis-
position,' " where state and federal courts
have concurrent jurisdiction. *See id.* at
817, 96 S.Ct. 1236 (quoting *Kerotest Mfg.
Co. v. C–O–Two Fire Equipment Co.,* 342
U.S. 180, 183, 72 S.Ct. 219, 96 L.Ed. 200
(1952)). **This is such a case.**

The New Jersey court has jurisdiction to
resolve the issues presented by Plaintiff to
this court. *See* N.J. Const. art. VI, Judi-
cial § III ("The Superior Court shall have
original general jurisdiction throughout
the State in all causes."). Judge Patterson
previously rejected Mrs. Goldman's argu-
ment that her ERISA claims necessarily
pre-empted state consideration as a matter
of law. *See Goldman* at *6 n. 7; *see also
Turnbow v. Pacific Mutual Life Ins. Co.,*
934 F.2d 1100, 1103 (9th Cir.1991) (holding
state courts fully competent to decide
ERISA preemption issues). The disposi-
tive factual issue—of whether the Gold-
mans deposited assets belonging to the
Estate or limited by state restraining or-
ders into the Plan account—is clearly one
which can (and should) be resolved in state
court.

---

11. The Estate disputes Mr. (and/or Mrs.) Goldman's account of these events, noting, among other things, that "Merrill Lynch's own records [indicate] that this transfer was done on Friday, April 12, 1991." *See* Certification of Barry A. Kozyra, Apr. 23, 1997, *In Re: Byrdie Goldman.*

It is especially noteworthy that the transfer was done on Friday, April 12, 1991 [accord-ing to Merrill Lynch's records]. Donald Goldman has steadfastly maintained for years both in the courts of New Jersey and New York that he met with his mother while she was in her hospital bed at John F. Kennedy Medical Center in Edison on Saturday, April 13, 1991.

Applicability of the *Colorado River* holding to the instant case depends upon an analysis of the following six factors:

(i) the assumption of jurisdiction by either court over any res or property;

(ii) the inconvenience of the federal forum;

(iii) the avoidance of piecemeal litigation;

(iv) the order in which jurisdiction was obtained;

(v) whether state or federal law supplies the rule of decision; and

(vi) whether the state court proceeding will adequately protect the rights of the party seeking to invoke federal jurisdiction.

*Village of Westfield v. Welch's*, 170 F.3d 116, 121 (2d Cir.1999). The first four of these factors were enunciated in the *Colorado River* decision itself. *See Colorado River* at 818, 96 S.Ct. 1236. The remaining two factors were added by the Supreme Court in *Moses H. Cone Memorial Hosp. v. Mercury Construction Corp.*, 460 U.S. 1, 23–27, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983).

In determining whether abstention is appropriate, "[n]o one factor is necessarily determinative; a carefully considered judgment taking into account both the obligation to exercise jurisdiction and the combination of factors counseling against the exercise is required." *Colorado River* at 817–18, 96 S.Ct. 1236 (internal citations omitted). "The weight to be given to any one factor may vary greatly from case to case, depending on the particular setting of the case." *Moses H. Cone* at 16, 103 S.Ct. 927.

The Estate argues that under the circumstances of this case all six factors weigh in favor of abstention. (Estate Letter Mem., Aug. 18, 1999, at 8.) First, "[t]he New Jersey Court has assumed jurisdiction over property relating to Byrdie Goldman's Estate." (*Id.*) Second, "[t]he Estate is a New Jersey resident and resolution would be most convenient in the New Jersey Court, where, importantly, the initial and underlying action took place." (*Id.*) Third, "[i]f this Court fails to abstain from this matter, not only will extended piecemeal litigation result and waste the judiciary's (and the Estate's) resources, but the Goldmans will be encouraged in their efforts [to avoid the New Jersey Court's rulings]." (*Id.* at 8–9.) Fourth, both the New Jersey and the New York actions were filed before the instant Federal action, and "a Final Order has already been issued in New Jersey and collection is in its final stages" and "[t]he New York state action has been tried to conclusion and the litigants are awaiting a judgment." (*Id.* at 9.) Fifth, "the real issue is implementation of a New Jersey court's Order requiring Donald Goldman to repay money he wrongfully took," albeit "rephrased as an ERISA claim for the sole purpose of circumventing the New Jersey judgment." (*Id.* at 10.) Sixth, "[t]he ERISA claim could have been raised in either the New Jersey or the New York state courts." (*Id.*)

Mrs. Goldman advises the Court that it "should thumb the scale in favor of exercising jurisdiction," and that "[w]hen the dispute lacks a *res* and the federal forum is just as convenient as the state, these two factors favor retention of the case in federal court." (Goldman Letter Mem., Aug. 19, 1999, at 8.) (She offers no specifics as to the (in)applicability of the *Colorado River* factors to instant circumstances.)

The Court agrees with the Estate that abstention is appropriate.

### A. *Assumption of Jurisdiction Over a Res*

After finding that Mr. Goldman had deposited into the Plan account some $2,000,000 (that the Court believed were proceeds of bearer bonds stolen from the Estate), the New Jersey Probate Court assumed jurisdiction over the Plan account, issuing a writ of execution on March 20, 1997, and

granting the Estate's Motion for Sale of Assets and Turnover of Funds on May 13, 1997. This first factor supports abstention.

### B. Inconvenience of the Federal Forum

Since the Estate is currently pursuing claims against the Goldmans in New York State Supreme Court, it cannot be concluded that litigation in this Court is inconvenient for the Defendant, *see, e.g., Arkwright–Boston Manufacturers Mut. Ins. Co. v. City of New York,* 762 F.2d 205, 210 (2d Cir.1985), although it would clearly be more convenient for the Estate to resolve all open issues in the New Jersey forum.

### C. Avoidance of Piecemeal Litigation

The key remaining issue in this case— whether funds belonging to the Estate or covered by restraining order were deposited into the Plan account—is also before the New Jersey Court. Trying a the identical issue in both forums would "waste judicial resources and invite duplicitous effort." *See Arkwright–Boston* at 211. The New Jersey Court has been comprehensively involved in all issues surrounding the will and estate of Byrdie Goldman since 1993, as previously described. The efficient and competent resolution of the remaining issue(s) is best left to that court. *See De Cisneros v. Younger,* 871 F.2d 305, 308 (2d Cir.1989) (affirming *Colorado River* abstention relying upon, among other things, the fact that the state proceedings were "more comprehensive than the federal proceedings"); *Arkwright–Boston* at 211 ("[C]onsolidation in the state court could lead to more efficient fact-finding and more reasoned decision-making.").

### D. Order in Which Jurisdiction Was Obtained

The instant action was not only filed three and a half years after the New Jer-

sey action was filed, but it was filed in response to execution of the New Jersey judgment. Although some progress has also been made in this Court, the near completion of the New Jersey action, argues in favor of abstention. *See, e.g., De Cisneros* at 308 (affirming abstention where district court had already denied a motion for summary judgment).

### E. State or Federal Rule of Decision

The ERISA question raised by Plaintiff is collateral to uniquely state law issues and functions, namely the fair and final adjudication of the Byrdie Goldman will and administration of her estate. *See Markham v. Allen,* 326 U.S. 490, 494, 66 S.Ct. 296, 90 L.Ed. 256 ("[A] federal court has no jurisdiction to probate a will or administer an estate . . . .").

### F. Adequate Protection of Plaintiff's Rights

Mrs. Goldman has offered no evidence or argument that the New Jersey (or New York) state courts are unwilling or unable to entertain her ERISA claims. Indeed, as noted, Judge Saunders has repeatedly indicated the New Jersey court's willingness to entertain Mrs. Goldman's claims.

### V. Conclusion and Order

For the reasons stated above, Plaintiff's application for judgment by default is denied; Defendant's motion for an order denying Plaintiff's application for judgment by default is granted; Defendant's motions to dismiss the Amended Complaint [108–1] and/or for summary judgment [108–2] are denied without prejudice.

Upon the principles set forth by the Supreme Court in *Younger* and *Colorado River,* the Court hereby abstains from further consideration of the instant action pending completion of *In the Matter of the Estate of Byrdie Goldman* in New Jersey Superior Court.[12] The Court hereby vacates all restraints (e.g. stays) from this

---

12. The Court stays, rather than dismisses, the instant action in the event that any of Mrs.

Goldman's claims prove to be not cognizable in the Chancery Division of the Superior

Court upon the Estate's enforcement of the New Jersey Superior Court orders and judgments. *See, e.g., Casa Marie,* 988 F.2d at 270 (abstaining from adjudication of federal plaintiffs' claims and vacating a permanent injunction restraining federal defendants' enforcement of a prior state court judgment against federal plaintiffs). **Plaintiff is directed forthwith (but in no event later than 21 days from the date hereof) to present her claims, if any, individually and/or as trustee of the Plan, to the New Jersey Superior Court in Passaic County, where** *In the Matter of the Estate of Byrdie Goldman* **remains pending.**[13]

The Clerk is respectfully requested to place the instant case on the suspense calendar. Plaintiff is directed to inform the Court, in writing, on or before June 1, 2000, and every three months thereafter, of the status of New Jersey (and New York) State court proceedings involving the Estate and herself, Mr. Goldman, and/or the Plan. **Failure to comply with these directives may result in sanctions, including dismissal of the case.**

Court. *See Deakins v. Monaghan,* 484 U.S. 193, 202, 108 S.Ct. 523, 98 L.Ed.2d 529 (1988). *See also 767 Third Ave. Assoc. v. Consulate General of Socialist Federal Republic of Yugoslavia,* 60 F.Supp.2d 267, 280 (S.D.N.Y.1999); *Quackenbush v. Allstate Ins.*

*Co.,* 517 U.S. 706, 721, 116 S.Ct. 1712, 135 L.Ed.2d 1 (1996).

**13.** The Court believes that Judge Susan L. Reisner has succeeded Judge Saunders with respect to *In Re: Byrdie Goldman.*